385 F.2d 581
 128 U.S.App.D.C. 59
 BROTHERHOOD OF RAILROAD TRAINMEN, Switchmen's Union of North
America, et al., Appellants,
v.
The AKRON & BARBERTON BELT RAILROAD COMPANY et al., Appellees.
ORDER OF RAILWAY CONDUCTORS AND BRAKEMEN, Appellant,
v.
The AKRON & BARBERTON BELT RAILROAD COMPANY et al., Appellees.
The AKRON & BARBERTON BELT RAILROAD COMPANY et al., Appellants,
v.
BROTHERHOOD OF RAILROAD TRAINMEN et al., Appellees.
The AKRON & BARBERTON BELT RAILROAD COMPANY et al., Appellants,
v.
ORDER OF RAILWAY CONDUCTORS AND BRAKEMEN, Appellee.
BROTHERHOOD OF LOCOMOTIVE FIREMEN AND ENGINEMEN, Appellant,
v.
BANGOR AND AROOSTOOK RAILROAD COMPANY et al., Appellees.
BROTHERHOOD OF LOCOMOTIVE FIREMEN AND ENGINEMEN, Appellant,
v.
The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY et al., Appellees.
BANGOR AND AROOSTOOK RAILROAD COMPANY et al., Appellants,
v.
BROTHERHOOD OF LOCOMOTIVE FIREMEN AND ENGINEMEN, Appellee.
The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY et al., Appellants,
v.
BROTHERHOOD OF LOCOMOTIVE FIREMEN AND ENGINEMEN, Appellee.
BROTHERHOOD OF RAILROAD TRAINMEN, Appellant,
v.
The AKRON & BARBERTON BELT RAILROAD COMPANY et al.,
Appellees (two cases).
 Nos. 20152, 20158, 20172, 20191-20193, 20215, 20216, 20229, 20249.
 United States Court of Appeals District of Columbia Circuit.
 Argued Sept. 28, 1966.
Decided May 12, 1967, Supplemental Opinion July 31, 1967, As
Amended Sept. 21,1967 and Feb. 16, 1968,
Certiorari Denied Jan. 29, 1968, See 88
S.Ct. 851, 852,856.
 
 Mr. Milton Kramer, Washington, D.C., with whom Mr. Martin W. Fingerhut, Washington, D.C., was on the brief, for appellants in Nos. 20,152, 20,229 and 20,249 and appellees in No. 20,172.
 Mr. James D. Hill, Washington, D.C., for appellant in No. 20,158 and appellee in No. 20,191.
 Mr. Joseph L. Rauh, Jr., Washington, D.C., with whom Messrs. John Silard, Daniel H. Pollitt, Isaac N. Groner, David Epstein and Stephen E. Moss, Washington, D.C., were on the brief, for appellant in Nos. 20,192 and 20,193 and appellee in Nos. 20,215 and 20,216.
 Mr. Francis M. Shea, Washington, D.C., with whom Mr. Richard T. Conway, Washington, D.C., was on the brief for appellants in Nos. 20,172, 20,191, 20,215 and 20,216 and appellees in Nos. 20,152, 20,158, 20,192, 20,193, 20,229 and 20,249. Messrs. David Booth Beers and Ralph J. Moore, Jr., Washington, D.C., also entered appearances for appellants in Nos. 20,215 and 20,216.
 Before DANAHER, Circuit Judge, BASTIAN, Senior Circuit Judge, and LEVENTHAL, Circuit Judge.
 LEVENTHAL, Circuit Judge:
 
 
 1
 This opinion deals with a number of appeals and cross-appeals in the railroad work rules litigation.
 
 
 2
 It may help if at the outset we indicate generally the nature of our views, though their precise exposition and the complexity of the issues require a long opinion. Part I of this opinion reviews the history of the passage by Congress in 1963 of a law providing for compulsory arbitration of the work rules controversy with an Award of two years duration. In Part II we approve the conclusion of the District Court that the work rules in effect following the expiration of the Award in 1966 did not revert to the 1963 condition and that the new plateau of work rules, established for early 1966 by the Award, continued in effect unless changed in accordance with the Railway Labor Act. In Part III, reversing a ruling of the District Court, we hold that even prior to the expiration of the Award the carriers had a statutory duty to respond to notices of the unions and begin collective bargaining about the rules to become effective following the expiration of the Award. In Part IV we conclude, reversing the District Court, that the railroad companies violated their duty to bargain with the Firemen, on the notice relating to prospective work rules, and with the Trainmen. We affirm other aspects of the decree, albeit for reasons somewhat different from those of the District Court, since we conclude that the railroads had no statutory duty to bargain over either another notice served by the Firemen, which sought to undermine rights vested under the Award, or the early notice served by the Conductors.
 
 
 3
 * Understanding of the issues will be aided by a historical review of the problem.
 
 
 4
 The phenomenal growth of railroads in the 19th century was accompanied by evolution of complementary employee organizations. Railroad workers were among the first to organize unions to present employee demands collectively. The Order of Railway Conductors was founded in 1868, the Brotherhood of Railroad Firemen and Enginemen in 1873, and the Brotherhood of Railroad Trainmen in 1883. Labor relations in the railroad sphere has been the subject of Congressional enactments, and is now governed essentially by the Railway Labor Act.[1]
 
 
 5
 The last hundred years have also witnessed the evolution of an elaborate 'common law' embracing the relations of railroad management and labor. There exists a roughly defined system that is the product of long-established practices and understandings, collective bargaining agreements, court decisions and administrative orders. The system covers among other things the manning of trains and the assignment of tasks to employees. These principles and patterns of behavior are collectively denominated 'work rules.'[2] As the Supreme Court has aptly put it, the railroad industry with its complex of regulations is virtually a 'state within a state.'[3]
 
 
 6
 Work rules concerning firemen date from the early days of the industry. Their initial chore was to select and load fuel into the wood-burning locomotive. The appearance in the late 1920's of the diesel engine spawned the problems that beset the industry to this day. The carriers consistently contended that the former loaders of wood were now merely dead wood. Yet beginning in 1933 the Brotherhood of Locomotive Firemen and Enginemen (hereafter BLFE) negotiated individual agreements with various carriers to preserve the continued status of firemen-helpers. The BLFE in 1937 joined with substantially all United States carriers in signing the National Diesel Agreement, providing for the employment of firemen-helpers on practically all diesel powered locomotives. Similar terms endured in subsequent contracts, including the Diesel Agreement of 1950.
 
 
 7
 While work rules retaining positions for firemen became thus established, the industry's quest for modernization resulted in almost one hundred percent diesel operation. In 1956 the carriers gave hint that intense competition from other modes of transport and the resulting financial pressure would no longer permit preservation of the ancient status. During negotiations on their proposal to give management the discretion to determine the employment of firemen the carriers withdrew this plan by agreeing to a three-year moratorium on such changes in work rules. But the die had been cast, and the carriers argued that the verdict of history and technology had come in, pronouncing railroad firemen extraneous members of a train crew. So too, they asserted, advanced technology and innovations would permit sharp reductions in the level of what is called the 'crew consist,' specifically the number of brakemen needed for the safe operation of the train.
 
 
 8
 It is against the backdrop of the always 'sensitive and touchy problem'[4] of overmanning and efforts to overcome it that we focus on the events more immediately leading up to these appeals. In 1959 the carriers served notices under Section 6 of the Railway Labor Act,[5] proposing the elimination of firemen from freight and yard service, and the abrogation of regulations fixing the size of train crews. The following year, 1960, the unions served a series of counter-proposals directed at continuing and even extending the use of firemen and at setting the crew consist level at not less than one conductor and two brakemen plus such additional trainmen as the assurance of maximum safety demanded.
 
 
 9
 Shortly thereafter, in an effort to aid in the adjustment of this dispute, President Eisenhower appointed a special Presidential Railroad Commission to study the various facets of the problem. This Commission issued its report and recommendations in 1962. In general the carriers accepted the findings, but the unions balked.
 
 
 10
 Meanwhile the lengthy procedures contemplated and mandated by the Railway Labor Act continued. Negotiations and mediation failed to bridge the gulf between the parties. The atmosphere of crisis heightened, for the Supreme Court ruled in March of 1963 that all the tools of the Act prescribed for the parties had been tried and found inadequate, and they were thus free to resort to self-help: that is, the unions could lawfully strike, or the carriers could unilaterally impose the new rules.[6]
 
 
 11
 The last device in the statutory arsenal was invoked. Acting under Section 10 of the Railway Labor Act, 45 U.S.C. 160, the President, on a finding by the National Mediation Board of the threat of deprivation of essential transportation services, convened an Emergency Board to make a prompt investigation and report. For thirty days following the rendition of such a report no party may take unilateral action. The investigation was made and the report was filed.
 
 
 12
 Once again the unions proved unwilling to accede to the recommendations of others. During July of 1963 a flurry of tense negotiations was spurred by the active intervention of President Kennedy and the participation of Secretary of Labor Wirtz. The unions rejected the President's proffer of the services of Justice Arthur Goldberg as arbitrator of the dispute. For a fleeting period it appeared that voluntary arbitration would provide the answer, but though the parties indicated willingness in principle they could not get together in the procedural particulars of arbitration.
 
 
 13
 A strike was imminent. The country was faced with a serious emergency. No outstanding techniques remained to move the antagonists to a responsible accord. Only Congress could avert a national catastrophe, and it was to Congress that President Kennedy turned for unprecedented measures.[7] The Administration proposal, submitted July 22, 1963,[8] would have authorized the Interstate Commerce Commission to serve, in effect, as the agency for compulsory settlement of the threat by empowering it to put into effect, on the application of the parties, any of the changes proposed in the notices of 1959 and 1960 with such modification as it found appropriate in reconciling the private and public interest. That resolution made it clear that these were to be only interim work rules to be effective until the parties themselves agreed on more permanent terms, but in on event to last for more than two years.
 
 
 14
 The law that was actually passed differed in various particulars from the Administration measure. The 'one significant change'[9] made was the substitution of an independent ad hoc board of arbitration for the Interstate Commerce Commission, principally for the reason that Congress wanted to emphasize the peculiar and non-precedential nature of its emergency intervention. By August 28, 1963, this unique compulsory arbitration law, public Law 88-108, 77 Stat. 132, had passed both Houses of Congress and received presidential approval. We set out this statute in an appendix to this opinion.
 
 
 15
 Public Law 88-108 expressly forbade any unilateral self-help by the parties who had served or received the notices of 1959 and 1960. It created a Board of Arbitration (since designated Board 282), to be composed of seven members, two each representing the carriers and unions, and the other three to be selected by the President if, as happened, the parties could not agree even on mutually acceptable neutral members. The Board was ordered to pass on the two focal issues of the use of firemen and the size and composition of train crews. The Award (since designated Award 282) was to 'be binding on both the carrier and organization parties to the dispute and * * * constitute a complete and final disposition of the aforesaid issues * * *.' (Section 3). The effective date of the Award was set at sixty days after filing in the United States District Court for the District of Columbia. According to Section 4 the Award was to 'continue in force for such period as the arbitration board shall determine in its award, but not to exceed two years from the date the award takes effect, unless the parties agree otherwise.'[10] It is this provision specifying the maximum mandatory duration that has sparked the issues we are now required to judge.
 
 
 16
 The Board met, held hearings, took evidence. It issued an Award that provided: 'This Award shall continue in force for two years from the date it takes effect, unless the parties agree otherwise.' An important extension agreement is that of the carriers and BLFE, which extended the termination date to March 30, 1966. Except for such agreement the Award expired at the close of the two year period on January 24, 1966.[11]
 
 
 17
 Award 282 held that the nearly two hundred carriers involved could eliminate ninety percent of the firemen positions, and set forth a procedure for dismissal and attrition. It was a staggering blow to the BLFE. The Award did not, however, authorize a single spasmodic discharge of thousands of firemen. Indeed, in some aspects it was 'highly favorable to the employees,' see In re Certain Carriers, etc., 229 F.Supp. 259, 261 (D.D.C.1964). Thus the Award guaranteed permanent employment for life, or until retirement or resignation, for every fireman who had been in active service for more than ten years, with a comparable job insured for all with service of two years or more. Those firemen with less than two years seniority were accorded severance allowances, amounting in some cases to six months pay. Under the terms of this Award the carriers have pruned eighteen thousand firemen from their ranks, paid out some $36,000,000 in separation benefits, and provided comparable jobs to twelve hundred former firemen.
 
 
 18
 On the crew consist issue, the Board determined that a single national standard would be inappropriate. It ruled that no change in crew consist be made except pursuant to the Award. Then it provided that where existing work rules required more or less than two trainmen, any party might give notice of a proposed change. If after conferences were held by the local properties no agreement was forthcoming, the issue could be referred to a special board of adjustment created at the local level. The Award articulated a series of 'guidelines' to be followed by these special boards in resolving particular disputes. Many crew consist agreements and special awards were made under this procedure.
 
 
 19
 Pursuant to Section 9 of the Railway Labor Act, 45 U.S.C. 159 (1964), as incorporated by reference in Section 4 of Public Law 88-108, the unions sued in the District Court for the District of Columbia to impeach the Award. The attack was two-pronged. First, they contended that the statute authorizing compulsory arbitration in this context was unconstitutional as beyond the power of Congress, or in the alternative as delegating power to an administrative body without adequate specificity of standards. Second, the unions argued that the Award did not conform to the statute under which it claimed vitality. The District Court rejected both challenges, and both approved the statute and confirmed the Award. Brotherhood of Locomotive Firemen and Enginemen v. Chicago, B. & Q.R.R., 225 F.Supp. 11 (D.D.C.1964). This court affirmed,[12] 118 U.S.App.D.C. 100, 331 F.2d 1020, and the Supreme Court denied certiorari, 377 U.S. 918, 84 S.Ct. 1181, 12 L.Ed.2d 187 (1964).
 
 
 20
 In subsequent months there poured into the courts, here and elsewhere, a number of actions, some brought by unions and some by railroads, presenting a plethora of particular problems,[13] but these skirmishes need not detain us. What is critical to the situation now before us is this. Instead of using the two-year period specified by Congress and the Award to continue meaningful negotiations looking toward long range adjustments of the various vexing problems, guided by the experience gleaned from functioning under the Award's interim rules, the parties apparently focused on whether the expiration of the Award would leave them in a better position than they might achieve by return to the collective bargaining table, where some concessions might have to be made.
 
 
 21
 The positions adopted by the parties, distilled to their essentials, were as follows: The Unions believed that upon expiration of Award 282, authorized by Congress as a 'final' settlement for a period 'not to exceed two years,' it would have no continuing significance. They assumed that immediately upon the expiration of the Award the status quo ante would revive and the National Diesel Agreements would once more control. This position was shared by the other unions who presumed the prior crew consist rules would return from a two year consignment to limbo. But as a hedge the unions also, during the effective period of the Award, served notices proposing in substance that on termination of the Award there would come into effect rules that were substantially similar to the old work rules, with relatively minor adjustments.
 
 
 22
 Not surprisingly, the carriers took a different view. As they saw it, the status created by Award 282 had an enduring quality that transcended the formal effective period of that Award. But they too, 'just in case,' served counter-proposals on the unions to preserve the benefits the Award had carved for them. As will appear in greater detail, the carriers declined to discuss the merits of any of these notices at the few conferences that were held prior to the termination of the Award, reasoning that although Public Law 88-108 and the Award permitted bargaining during that period they nevertheless stopped short of imposing a legal duty to do so. These are the two central questions of these appeals: What rules were in force the day after Award 282 expired? What was the duty of the parties to bargain about changing those rules, and when did it arise?
 
 
 23
 These appeals reach us from the orders disposing of suits and counter-suits seeking declaratory and injunctive relief, brought by the carriers and by the Brotherhood of Locomotive Firemen and Enginemen (BLFE), the Brotherhood of Railroad Trainmen (BRT), and Switchmen's Union of North American (SUNA), and the Order of Railway Conductors and Brakemen (ORCB). See generally Bangor & A.R.R. v. Brotherhood of Locomotive Firemen, 253 F.Supp. 682 (D.D.C.1966) (Nos. 20192, 20193, 20215, and 20216); Akron & B. Belt R.R. v. Brotherhood of Railroad Trainmen, 250 F.Supp. 691; 252 F.Supp. 207 (D.D.C.1966) (Nos. 20152, 20172), supplemented, 254 F.Supp. 306 (D.D.C.1966) (Nos. 20229, and 20249); Akron & B. Belt R.R. v. Order of Railway Conductors, 253 F.Supp. 538 (D.D.C.1966) (Nos. 20158 and 20191).[14]
 
 II
 
 24
 In advance of the trial of these cases, the parties consented to the preliminary adjudication of the effect of the expiration of Award 282. In a guideline opinion underlying subsequent rulings, the District Court held that, even though the Award formally terminated, it had created a 'new plateau' of work rules, which were to continue in force until changed pursuant to the regular procedures of the Railway Labor Act.[15] See Akron & B. Belt R.R. v. Brotherhood of Railroad Trainmen, 250 F.Supp. 691, 695-697 (D.D.C.1966).
 
 
 25
 The BLFE argues that the intention of Congress in giving the Award a limited 2-year life was to deny it any further legal effect, to leave the parties as if the award had never been in existence, and to restore the status quo ante with the result that the day after the Award expired the work rules in effect were the same as those in effect when the statute was passed. This approach has a kind of formal logic, and certain provisions of Public Law 88-108 could be read this way. Our approach in ascertaining 'legislative intent' is hampered by the fact that the possibility that by the end of the formal duration of the Award the parties might not have agreed on anything to take its place is a subject on which the legislative history is, to use Justice Harlan's phrase, 'essentially negative, which shows with fair conclusiveness only that Congress was not squarely faced with the problem this case presents.'[16] In our case there is the added consideration that Congress was undoubtedly aware of the problem but apparently thought wisdom lay in avoidance of express delineation.
 
 
 26
 We think the mere limitation of the effective period of the Award neither implies nor compels the construction the unions seek. Our ruling is that the work rules created by the Award constituted a new plateau that was not automatically eroded when the Award expired. The legal underpinning for our ruling is not the Joint Resolution, which expired after 180 days of life-- except insofar as necessary to sanction the Award. The ruling is not based on the Award, which had only a 2-year life, or on any agreement of the parties. The predicate of our ruling is, simply, the force of the Railway Labor Act. Certain work rules were in force on January 24, 1966 (or March 30, 1966, in the case of the BLFE). The mandate of the Railway Labor Act requires that the work rules in effect on any particular day shall also be in effect the following day-- beyond the power of either party to institute a unilateral modification-- subject to change only in accordance with the procedures prescribed by the Act. These procedures begin with the notices required by Section 6 to be served by any party seeking a change at least thirty days in advance of the proposed effective date of such change. This newplateau reasoning applies even though the work rules are established by agreements of limited duration. 'The effect of 6 is to prolong agreements subject to its provisions regardless of what they say as to termination.'[17] It likewise applies even though the work rules are established by an arbitration award of limited duration.
 
 
 27
 This by no means suggests that there is no legal significance in establishing an award or agreement as one of limited duration. The limited duration has the obvious significance that work rules can be changed for the post-expiration period. The work rules can be changed, however, only by compliance with the provisions of the Railway Labor Act prescribing how changes in work rules are to be effectuated.
 
 
 28
 What we are in effect holding is that since Public Law 88-108 is silent as to the applicable legal rule, the case is governed by the combination of undeniable physical facts plus the general legal rule of the Railway Labor Act. The BLFE is constrained to find superseding intention in Public Law 88-108 which would in effect obliterate not only the Award as a document with legal effect but also the physical facts that came into being during the 2-year period. We think its construction of Public Law 88-108 would be unreasonable and inconsistent with the purposes and context of the legislation. It must have been reasonably contemplated that the Board of Arbitration might order deflation of the scope of existing overmanning. And it seems obvious that an automatic rescinding of any such pruning at the instant the Award was to terminate would spark the most unsettling havoc. To reach this result would necessarily mean trying to recreate a practically unrecoverable situation and sweeping away a host of rights that had already vested concomitant with the award, made final under the Act, permitting reductions in the work force. Such a view would also wipe out the supposedly permanent guaranty of employment for those thousands of employees whose seniority, the Award decreed, entitled them to lifetime protections.
 
 III
 
 29
 We turn now to the question to what extent and by what procedure the parties could and did lawfully invoke the machinery prescribed by the Railway Labor Act in order to change the work rules in effect on the railroads at the expiration of the Award, rules that had been prescribed by the Board (including the crew consist rules prescribed by various local boards).
 
 
 30
 As already stated, these work rules were not immutable. Congress had enacted a compulsory arbitration measure of limited duration. The appropriateness of a limited duration for a compulsory arbitration measure, articulated by the Supreme Court 50 years ago in Wilson v. New, had been emphasized by the President and Congress.[18]
 
 
 31
 When were the parties to bargain about possible changes in the work rules that survived the Award? All parties agree that negotiation during the pendency of Award 282 was permissible, but the carriers say it was not obligatory. In our opinion, however, bargaining during the pendency of the Award 282 was not merely a matter for the whim of the parties but was to be governed by provisions of the Railway Labor Act, and these provisions remained in effect during the life of the Award for purposes of regulating the responsibilities of the parties to bargain concerning changes proposed to become effective after the expiration of the Award.
 
 
 32
 The principles and objectives underlying Public Law 88-108 reveal that Congress placed a high premium on the opportunity for continued collective bargaining during the life of the Award, in the hope and expectation, apparently shared at that time by the parties themselves, that the unions and carriers would themselves work out a long range solution to these sensitive problems by the traditional devices of collective bargaining. This special statute served to give the Nation a temporary respite from the threat of a disastrous national rail strike by forbidding for two years any unilateral changes or resort to self-help and imposing instead interim rules to cover the situation. But as we have seen, both the statute and the Award expressly contemplated that the parties were free to alter or extend the rules fixed by Award.[19]
 
 
 33
 Public Law 88-108 established a procedure for formulating rules to govern for up to two years, in the absence of a negotiated pact. This did not displace the otherwise applicable provisions of the Railway Labor Act on the duty to bargain on changes proposed to become effective subsequent to the two-year period. President Kennedy in his nessage to Congress expressed the desire that the parties continue to confer on the ultimate resolution of their disputes.[20] A chief spokesman for the carriers, Mr. J. E. Wolfe,[21] assured the Senate Committee that the carriers understood that the Administration's bill 'imposes a duty on the parties to attempt to settle their differences' and would 'protect the public interest as a result of the establishment of these interim rules for a period of 2 years or less while the parties undertake, through collective bargaining, to bring about a more permanent solution of the problems.'[22] We are aware that in the reshaping of the measure the duty to bargain on the work rules was not expressly spelled out, but the plan was surely retained. Indeed the preambles of both measures expressly and unequivocally proclaimed the care taken to select a system which solved the immediate emergency 'in a manner which preserves and prefers solutions reached through collective bargaining.' Changes were made by the Congress-- notably the substitution of an independent ad hoc board for the Interstate Commerce Commission as the arbiter for the dispute.[23] There was not a breath of a suggestion, however, that Congress intended to remove or even downgrade the policy that the parties themselves should confer in order to reach long-range solutions through collective bargaining and agreement.
 
 
 34
 The carriers contend that all this means only that the parties were free to bargain during the Award if they wished, or even that they were encouraged to do so, but that for the two-year period the special act repealed pro tanto and by implication the duty under the Railway Labor Act to confer on proposed rule changes. We disagree. In our view Public Law 88-108 was intended to work the minimum disruption of permanent railroad legislation and normal collective bargaining. The only disruption wrought, the only 'repeal by implication', was that which necessarily accompanied the objective of staving off a cataclysmic strike by imposing a temporary settlement. We detect no glimmer of an intimation that the carriers were authorized to regard this as a two year hiatus in their obligation to bargain. Rather, we find much to militate against such a construction.
 
 
 35
 It is notable that the parties to this dispute had already agreed to submit their controversy to arbitration. They stumbled over procedural details. Congress viewed its role primarily as draftsmen of the specifics of an arbitration agreement to which the carriers and unions had already agreed in principle.[24] The statute in Section 4, the Award in Part IV, and the reports of both congressional committees carefully specified that the effective duration of the Award was limited to no more than two years, unless extended by stipulation, in order to restrict the 'scope and impact' of the statute.[25]
 
 
 36
 In essence then we have a mechanism tantamount to an arbitration agreement, albeit one drafted by Congress, that confers on the arbitrator the power to impose a settlement binding for up to two years. It becomes appropriate, then, to consider what would have been the rights and duties of the parties if they had themselves written the arbitration agreement. We are not concerned here with customary adjudicatory or grievance arbitration. Although socalled 'legislative' arbitration agreements are relatively infrequent they are not unknown. Under such agreements, prospective rules and working conditions, instead of being determined by agreement of the union and employer, as is customary, are determined by an arbitrator to whom the function is delegated.[26] Such a determination by arbitration is equivalent to a determination by agreement insofar as the rights and duties of the parties concerning future modification are concerned. An arbitration award does not operate to 'prevent the (parties) from seeking through negotiations under the procedures provided for by the Railway Labor Act or otherwise a new agreement * * * covering the rules * * *.'[27]
 
 
 37
 Responsible conduct of the process of collective bargaining, for consideration of proposals to modify work rules established by an agreement or award of limited duration, embraces conference and consultation prior to the termination date. This is the way responsible businessmen deal with each other when they plan to continue a business relationship-- for example, in negotiating on a contract or lease before its expiration date. This is the way responsible employers and unions implement the collective bargaining process, and respond to calls for change. And this is the way railroads and railroad unions must respond under the mandate of the Railway Labor Act.
 
 
 38
 The purpose of a Section 6 notice is 'to fix a procedure for the commencement of conferences between representatives of the two parties if changes are to be made in the contract.'[28] No rigid form for these notices is defined in the statute.[29] All that is specified is thirty days written notice of a proposed change. The Act requires that within ten days a time and place for conference be set, and that the first conference be held within the 30-day period.
 
 
 39
 To recapitulate, the Railway Labor Act not only requires railway employers and unions to confer and bargain on work rules established by agreements or awards having a fixed expiration date when one party wants to change the rules, but permits the statutory machinery to be invoked prior to expiration in order to seek an agreement on changes to become effective on or after expiration.
 
 
 40
 If an agreement (or award) contains a fixed expiration date, rather than the common indefinite or automatic self-renewal term, then the notice must indicate a proposed effective date for changes that is not only at least thirty days after the notice, but also a time after the outstanding agreement or award expires. Nothing in the Railway Labor Act, or the scheme of Public Law 88-108, forbids service of a notice more than thirty days before the suggested rules would or could be effective, and nothing relieves the recipient from the duty to commence bargaining at that earlier stage.
 
 
 41
 The carriers seek to buttress their claim of pro tanto repeal by implication by arguing that it can hardly be supposed that Congress intended to permit the unions to ready themselves to strike on January 25, 1966. The only forecast of that day we can find in the legislative history is the assumption that it would be preceded by an agreement of the parties. And that in turn, in our view, assumes that responsible collective bargaining would have been in train some time prior to the expiration date. If we turn from speculation about legislative intent to the realities of the Railway Labor Act, we are aware that the conferences triggered by Section 6 notices are typically the beginning and not the end of the statutory procedures. If conferences proposed by a Section 6 notice are unavailing, either party can invoke the services of the National Mediation Board. While negotiations continue or the Board has jurisdiction, no self-help is permitted. The parties are free to submit their controversy to arbitration. If none of these techniques resolves the matter, the President may convene an emergency board to investigate the dispute and report back on the issues. Only when all these steps have been exhausted are the parties permitted to act unilaterally. 'For the procedures of the Act are purposefully long and drawn out, based on the hope that reason and practical considerations will provide in time an agreement that resolves the dispute.'[30]
 
 
 42
 We do not say that the time of service of notice is completely irrelevant to the duties of the parties. It may be that a notice served the day after the Award would betoken bad faith to the point of vitiating its validity. We shall have occasion to point out that certain union notices were defective for analogous reasons. But the mere fact that the union notices were served prior to January 25, 1966, did not relieve the carriers of their duty to confer and bargain prior to January 25, 1966. We are not considering a case where the railroads, while conceding that the unions had a right to begin bargaining prior to the expiration date, responded that the particular notice came too early, perhaps on the ground that it did not permit enough experience under the existing rules to spawn realistic and informed bargaining. In the case before us the carriers flatly refused to engage in any statutory bargaining whatever prior to the expiration date. Except in the case of objectionable union proposals discussed below, the carriers before us must be held to have breached their statutory duty under the Railway Labor Act to confer and bargain on the merits of proposed changes in work rules. The decree of the District Court embodies a contrary declaration, and to that extent it is reversed.
 
 
 43
 We now consider the effect of our reversal of the District Court's ruling that the notices were not effective to require negotiation until after termination of the Award. As we have seen, conferences are but the first step in the chain of Railway Labor Act procedures. Once they have been frustrated, one side to the dispute can move to the next tier of procedures, and indeed in at least one series of cases involving parties before us the National Mediation Board has accepted jurisdiction of the controversy. The carriers have foresaken their right to insist on conferences by their refusal to respect effective Section 6 notices. The standard for good faith bargaining is quite liberal. Certainly it does not compel agreement. Judge Bryan, after the most careful analysis, formulated the frequently quoted standard that the--
 
 
 44
 requirement of good faith bargaining is really a requirement of absence of bad faith. In order to show such lack of good faith it is necessary to establish facts from which it can be reasonably inferred that a party enters upon a course of bargaining and pursues it with the desire or intent not to enter into an agreement at all. American Airlines, Inc. v. Air Line Pilots Ass'n, 169 F.Supp. 777, 794 (S.D.N.Y.1958).
 
 
 45
 Applying such a test, the carriers have breached their duty to enter negotiations in good faith, for a refusal to bargain on an erroneous premise of law is no excuse.[31]
 
 IV
 
 46
 Although the statutory duty to bargain continued during the limited duration award, it was not unaffected by the temporary statute and the arbitration award. Their emanations do affect the conceptions of bargaining in good faith, pursuant to a good faith notice, inherent in the scheme of the Railway Labor Act. We shall develop our specific rulings by considering the three groups of unions in chronological order by dates of notices.
 
 
 47
 A. ORDER OF RAILWAY CONDUCTORS AND BRAKEMEN (ORCB)
 
 
 48
 One group of cases before us, Nos. 20158 and 20191, concerns the Order of Railway Conductors and Brakemen (ORCB).[32] On Monday March 23, 1965, that union, expressly relying on the provisions of the Railway Labor Act, served notices on the carriers which proposed a rule requiring not less than one conductor and two brakemen on all classes of road train service thirty days after notice. That date was, obviously, a full nine months prior to the expiration date of the Award. The carriers considered the notices premature and refused to concede any obligation to bargain on the merits of the proposals.[33] ORCB invoked the services of the National Mediation Board, which docketed the case, but suspended action when the District Court held the notices premature.
 
 
 49
 We think it manifest that the proposal to scrap the Award during its life time could be broached to the carriers to see if they were interested but could not be presented to them as a subject of bargaining that was mandatory under a statutory obligation. We agree with Judge Bryan's approach that the collective bargaining system of the Railway Labor Act subsumes and presupposes a bargaining 'in good faith.'[34] The issue of good faith is interlaced with 'bargainability'-- a term of art which means not only capable of being bargained but also a proper subject of mandatory bargaining. We have already held that the carriers were in bad faith in asserting that they had no legal obligation to bargain during the life of the Award. They had an obligation, we think, to bargain about changes to become effective with the expiration of the Award. But we also think that they had no obligation to bargain about a proposal to make changes during the life of the Award. Such an obligation would be inconsistent with an inherent and essential element of Public Law 88-108, which was intended to promote long range solutions through collective bargaining by removing the need to bargain over immediate crises.
 
 
 50
 The ORCB argues that the carrier's duty to bargain is reaffirmed by Section III of the award of Board 282 which directs the parties to resume local negotiations on crew consist. We agree that the unions could have called on the carriers to negotiate pursuant to the Award. But this is entirely different from the statutory duty imposed by Section 6 of the Railway Labor Act, upon which the union purported to rely. The Award machinery was essentially different from and displaced the Railway Labor Act concerning rules effective during the life of the Award. This is demonstrable from the provision of the Award that specified that if the parties were unable to arrive at an agreement their dispute should be referred to a local arbitration tribunal. This is, of course, entirely different from and supersedes the basic structure of the Railway Labor Act which provides for compulsory arbitration only for minor disputes, and contemplates mediation or voluntary arbitration where agreement has not settled 'major disputes,' i.e. disputes relating to changes in rates of pay, rules or working conditions.[35] In this context, we agree that these notices were premature.
 
 B. BROTHERHOOD OF RAILROAD TRAINMEN (BRT)
 
 51
 In another group of cases (Nos. 20152, 20172, 20229 and 20249) we are concerned with the Brotherhood of Railroad Trainmen (BRT).[36]
 
 
 52
 On June 30, 1965, BRT served a notice proposing that beginning January 26, 1966 (unquestionably after the termination of the Award) a new work rule be inserted in the agreements between the BRT and the carriers requiring that not less than two, or in some cases three, brakemen be included in the 'crew consist' of the carrier's runs. In most instances the carriers in turn served counter-proposals with respect to crew consist rules, although they took the formal position that the BRT notices were premature and that during the life of the Award the only proper procedure for instigating crew consist changes was in accordance with Part A(3) of Section III of Award 282.[37]
 
 
 53
 The carriers' denial of an obligation to bargain with the BRT was essentially based on the contention of prematurity which we have already considered and rejected.
 
 
 54
 We turn to the carriers' current argument that Section 6 of the Railway Labor Act cannot meaningfully impose a duty to bargain during the life of the Award about changes following its expiration, since this would undercut bargaining pursuant to the Award concerning work rules during the life of the Award. We see no inherent inconsistency such as we found in discussion of the ORCB proposals. Bargaining and arbitration for rules to be in effect for a two-year period are not inherently negatived by tandem bargaining under a different system over long-range rules. Conflict in scheduling might be a temporary problem, but it could hardly dignify a complete denial of a duty to bargain over the ultimate and dominant issues.
 
 
 55
 C. BROTHERHOOD OF LOCOMOTIVE FIREMEN AND ENGINEMEN (BLFE)
 
 
 56
 The third major group of cases, Nos. 20192, 20193, 20215 and 20216, involves the Brotherhood of Locomotive Firemen and Enginemen (BLFE).[38]
 
 
 57
 In November 1965 this union served notices to take effect at 12:01 a.m. on March 31, 1966, the day after the Award, as extended by stipulation, was to expire. There were three notices, each made expressly pursuant to the Railway Labor Act. Notice No. 1 related to the types of engine services on which the employment of firemen would be required, and would have pegged employment at a level of 6000 jobs below the terms of the National Diesel Agreement, but far above the level provided by Award 282. Notice No. 2 provided for compensation to firemen who had been relocated, severed, or otherwise disadvantaged by the operation of Award 282. By stipulation of the parties we need not here consider Notice No. 3, which set out a training program for apprentices. The carriers contended that all such notices were premature, and further contended that the second and third were not even proper subjects of collective bargaining. Several abortive conferences were held, but the carriers resisted any attempts to reach the merits of the proposed rules.
 
 
 58
 In the BLFE consolidated declaratory judgment actions, the District Court agreed with the carriers on the major points, holding Notices 1 and 2 not only premature but also non-bargainable although the carriers had not even challenged the bargainability of the first notice. The court's interjection seems not only to have provided an additional reason for holding that the carriers had not violated a legal obligation in the past, but also to have prompted the carriers to seek restriction of their obligation to bargain in the future.
 
 
 59
 With the controversy thus expanded when there was already uncertainty as to the exact legal rights of the parties, the issue became the subject of a legal ruling. Since the genie can not be put back into the bottle, we turn to consideration of the soundness of the determination by the District Court, and we conclude that it was not a correct statement of applicable legal doctrine.
 
 
 60
 The District Court reasoned that--
 
 
 61
 the employees may not in the guise of serving notices under Section 6 of the Railway Labor Act, seek to abrogate or set aside the Award. It must be borne in mind that the Award is the result of a compulsory arbitration conduced under a mandate of Congress and has the stamp of judicial approval in the form of a judgment in a proceeding to impeach it. Neither a carrier, nor a union may institute proceedings, directly or indirectly, to set aside any provision of the Award, or the operations or activities that have taken place under it or the results that have been achieved.[39]
 
 
 62
 Since these notices were found not to 'relate to matters subject to collective bargaining under the statute,' the court declared that they 'need not be complied with.' 253 F.Supp. at 689. We disagree and are of the view that Congress did not intend that either Public Law 88-108 or Award 282 would permanently excise from the scope of collective bargaining any proposals that otherwise would have been lawful under the Railway Labor Act. Applying this standard, we find that Notice No. 1 falls within the realm of proper collective bargaining, but Notice No. 2 does not.
 
 
 63
 We begin our reasons for reaching this conclusion with a review of the principles surrounding disputes about bargainability. The settled tradition under the Railway Labor Act reveals a firm obligation on the railroads and their employees to negotiate about changes in working conditions suggested by one side or the other. In the landmark case of Virginian Ry. v. System Federation No. 40, Railway Employees Dep't, 300 U.S. 515, 548, 57 S.Ct. 592, 81 L.Ed. 789 (1937),[40] Justice Stone held that while the Act does not compel agreement, it does demand those preliminary steps, triggered by a Section 6 notice, without which no agreement could be reached. The minimum requirements are that the employer at least meet with the union to listen to its proposals and to make a reasonable effort to achieve an accord.
 
 
 64
 The subjects for mandatory mutual consideration are defined in Section 6 merely by reference to 'rates of pay, rules, or working conditions'.[41] But the courts have ratified the practice of the industry so that the duty to bargain 'generally has been considered to absorb and give statutory approval to the philosophy of bargaining as worked out in the labor movement in the United States.'[42] That is, 'what carriers must legally bargain about is affected by what is in fact bargained about in the railroad world.'[43]
 
 
 65
 The scope of bargainability is extremely broad. The recent guidepost opinion in Order of Railroad Telegraphers v. Chicago & N.W. Ry., supra note 31, 362 U.S. at 338, 80 S.Ct. at 765 (1960) states:
 
 
 66
 In an effort to prevent a disruption and stoppage of interstate commerce, the trend of legislation affecting railroads and railroad employees has been to broaden, not narrow, the scope of subjects about which workers and railroads may or must negotiate and bargain collectively. Furthermore, the whole idea of what is bargainable has been greatly affected by the practices and customs of the railroads and their employees themselves. It is too late now to argue that employees can have no collective voice to influence railroads to act in a way that will preserve the interests of the employees as well as the interests of the railroad and the public at large.[44]
 
 
 67
 The court upheld the right to strike to compel bargaining on a proposed work rule change to prevent the carrier from abolishing positions in existence before a certain date. The court rejected the carrier's contention that the proposal was not part of a legitimate 'labor dispute' because it sought to perpetuate 'wasteful' and 'unnecessary' jobs.
 
 
 68
 The scope of 'work rules' discussed by railroads and unions over the past century, including the use of firemen and the manning of trains,[45] has greatly exceeded what a layman might expect the term to include. Bargaining in the rail industry has comprehended fields frequently reserved to management in other industrial contexts. Not until the railroads began to experience the pressure of advancing technology and vigorous competition from other modes of transportation after the Second World War was there any suggestion that some questions of mutual interest might be beyond the pale of required bargaining. Increasingly, the roads have come to use the allegation of non-bargainability, and have sought judicial rulings to protect managerial discretion.[46] Rarely have the courts sanctioned this technique, and recent pronouncements do not augur well for its encouragement.
 
 
 69
 This setting bids us be chary of the conclusion of the District Court that there was no bargainability in Notice No. 1 which proposed that for the future the parties establish work rules different from those prescribed by the Award for a two-year period. The court stated that Notice No. 1 'demands the restoration of firemen on those runs for which Award 282 expressly held firemen were unnecessary. Obviously, compliance with this notice would be a consent to abrogate and do away with the outcome of the arbitration.'[47] The District Court gave no clue as to how in its opinion a Section 6 notice could validly propose changes in the work rules established by the Award, by what method, and to what extent.
 
 
 70
 In our view its conclusion was erroneous. The crisis conditions of 1963 evoked an unusual response from Congress, but one not intended to displace totally the framework of labor relations law and practice in the field. The phrasing of Public Law 88-108 and the reports that accompanied it make clear that Congress in its controlled response did not intend to effect a permanent alteration in development of collective bargaining. The preamble set the tone of the statute, declaring that 'it is desirable to achieve (the protection of the national interest) in a manner which preserves and prefers solutions reached through collective bargaining * * *.' According to Section 8, the statute expired of its own terms one-hundred and eighty days after enactment. The Award of the Arbitration Board, by virtue of Section 4, could not 'exceed two years from the date the award takes effect, unless the parties agree otherwise.' Section IV of the Award itself reiterated the limited duration of the terms imposed and specified it would be in force for two years 'unless the parties agree otherwise.'
 
 
 71
 This dual theme of limited survival and contractual freedom infuses a proper resolution of this case, and does so with a spirit that is frustrated by the District Court's conclusions of non-bargainability (and indeed of prematurity). In providing in Section 3 of the law that the Award would be 'binding on both the carrier and organization parties' and constitute a 'complete and final disposition' of the major issues, Congress meant only that the Board's conclusions were to have the status of arbitration awards in the classic sense, not merely of mediation suggestions or fact-finding as in the ordinary major dispute under the Railway Labor Act. But Congress contemplated and intended that the parties could continue to work out a settlement different from that imposed by the Board to be effective for a limited two-year period. In submitting the Administration draft to Congress, 'President Kennedy repeatedly emphasized to the Congress his hope that the dispute could eventually be settled by collective bargaining.' Brotherhood of Locomotive Engineers v. Chicago, Rock I. & Pac. R.R., supra note 4, 382 U.S. at 431, 86 S.Ct. at 598. The President 'expressed no desire to have Congress pass a law that would finally and completely dispose of the problem,' observing that it would be "wholly inappropriate to make general and permanent changes in our labor relations statutes * * *." Id. at 432, 86 S.Ct. at 598. And the Congress 'enacted the bill proposed by the President' with but 'one significant change' not relevant here. Ibid.
 
 
 72
 Congress emphasized in unambiguous terms that the parties were not to be locked in by the terms of the Award on the firemen and crew consist issues:
 
 
 73
 It should be especially noted that, although the joint resolution provides for arbitration on these two issues, the parties may still bargain collectively on these issues, and resolve them among themselves. This process may take place before the arbitration board is established; after the board has initiated its proceedings; and may also take place after the board has made an award. By agreement, the parties may make the appointment of the board unnecessary; may make the decision of the board unnecessary; and may supersede the decision of the board-- all through collective bargaining. H.R.Rep. No. 713, 88th Cong., 1st Sess. 13 (1963).
 
 
 74
 We find it impossible to accommodate the operative language and animating philosophy of Public Law 88-108 with the District Court's holding that Notice No. 1 was non-bargainable. The carriers argue now that the District Court did not foreclose all possibility of altering the rules imposed by the Board, but meant only to vindicate its efforts by precluding return to the status quo ante. Even if we agreed that the BLFE's Notice No. 1 would have that effect,[48] nothing we detect forbids proposing just such a complete regression. At least, we hold that under the Railway Labor Act, and after taking into account such qualification of that law as is fairly implied from Public Law 88-108, the BLFE could legitimately require that the carriers negotiate about these proposals for work rules to be operative in the future.
 
 
 75
 Nothing compels the carriers to accede totally to changes proposed in Notice No. 1, and indeed in light of the realities of collective bargaining it is unlikely that the BLFE expects to insist on complete acceptance of its suggestions. But certainly there was no disability prohibiting the opener that the BLFE included in its first notice.
 
 
 76
 Notice No. 2, however, falls in a different category. It did not propose certain rule changes to govern the future operation of the railroads. It was aimed directly and undeniably at vitiating the Award of the Arbitration Board, an Award that has long since received judicial confirmance and been fully implemented by the parties. Although Notice No. 2 expressly refers to Section 6 of the Railway Labor Act, the notice on its face demonstrates the irrelevance of Section 6, and the 'major disputes' provisions of the Railway Labor Act in general.
 
 
 77
 Notice No. 2 explicitly proposed that 'employees whose employment and seniority were terminated by the application or misapplication of the Award of Arbitration Board 282 will, on (the expiration of the Award as extended by stipulation), be recalled and restored to the seniority roster and employed with their original seniority date and used as firemen (helpers) * * *.' In subsequent sections, the notice proposed that employees terminated in the course of implementing Award 282 be reimbursed for monetary loss due to the termination and deprivation of seniority, including expenses incurred for meals, travel, lodging, and change of residence when relocating for other assignments.
 
 
 78
 These proposals relate to alleged past grievances. We are concerned here with bargainability, and instinct in the essence of collective bargaining is a notion of mutuality, that if a subject is brought up each side has at least the authority both to offer and to concede.
 
 
 79
 What is the status of the union concerning the subject it proposed for bargaining in Notice No. 2? We turn to Elgin, J. & E. Ry. v. Burley, supra note 35, 325 U.S. at 739, 65 S.Ct. at 1297:
 
 
 80
 To settle for the future alone, without reference to or effect upon the past, is in fact to bargain collectively, that is, to make a collective agreement. That authority is conferred independently of the power to deal with grievances, as part of the power to contract 'concerning rates of pay, rules, or working condition.' It includes the power to make a new agreement settling for the future a dispute concerning the coverage or meaning of a pre-existing collective agreement. For the collective bargaining power is not exhausted by being once exercised; it covers changing the terms of an existing agreement as well as making one in the first place.
 
 
 81
 But it does not cover changing them with retroactive effects upon accrued rights or claims. For it is precisely the difference between making settlements effective only for the future and making them effective retroactively to conclude rights claimed as having already accrued which marks the statutory boundary between collective bargaining and the settlement of grievances.
 
 
 82
 The Court held that a union had no lawful authority to bargain for some of its members in settling claims they asserted against the railroad arising from the application of new work rules. The Court observed that the railroad was not entitled to assume from the union's status as bargaining agent that it had the right to settle claims for past grievances, and that any agreements reached were without legal significance.
 
 
 83
 This analysis has an immediate bearing on our situation. The BLFE proposed that the carriers jettison the rights that had accrued to them under the Award, for the Notice by its terms is limited to rehiring and reimbursing those employees terminated in implementing Award 282. If Award 282 meant anything it provided the sanction of Congress for the railroad's authority to discharge thousands of firemen. This permission was sharply narrowed by stringent protective provisions under which severed employees have already received many millions of dollars in benefits. The rights to these payments vested when the employees were discharged pursuant to the Award. The BLFE Notice proposed that the carriers renounce their vested rights. But the bargainability of this subject matter as a proposal for a change in 'work rules' is undercut by the fact that the Elgin case squarely denies the BLFE any warrant in law to 'bargain' over any possible concession on the employee's side to make a refund, or even partial refund, of any severance benefits already vested or paid. Clearly a proposal that cannot lawfully be adopted is non-bargainable.[49] Since the union could not bargain away any part of the rights that accrued to employees under the Award, it could not compel the railroads to bargain on a proposal that they surrender rights that accrued to the carriers under the Award, which defined and limited the liability of the carriers arising from changes made in accordance with the Award.
 
 
 84
 In Notice No. 2 the union claimed there had been misapplication of the award. As to this it suffices to point out that Section 8 of the Railway Labor Act[50] and Section 4 of Public Law 88-108 permit the union to bring forward, questions of interpretation as to the scope and applicability of the Award for resolution by Board 282.[51] But these would not be comprehended by Section 6 of the Railway Labor Act, governing proposed changes in work rules, classified as major disputes.[52] The rest of Notice No. 2 is inherently an attack on the fairness of the Award-- and that is not bargainable under Section 6 consistently with the purpose of Public Law 88-108, and the Award thereunder and its judicial confirmance.
 
 
 85
 It is our hope and contemplation that any further litigation will be conducted with a fresh outlook. The halls of justice should not be an arena where gladiators are spurred on in desperate combat. They provide a forum where legal disputes can be settled, with a minimum of rancor, so as to further the Congressional objective of agreement and, if possible, harmony between carriers and unions.[53]
 
 
 86
 The parties are directed to submit within 10 days a proposed judgment, and to confer and endeavor to agree thereon. At that time the parties may also request supplemental rulings on any matters that have not been discussed in this opinion.
 
 
 87
 Affirmed in part, reversed in part.
 
 APPENDIX
 Public Law 88-108
 ACT OF AUGUST 28, 1963, 77 STAT. 132
 
 88
 Whereas the labor dispute between the carriers represented by the Eastern, Western, and Southwestern Carriers' Conference Committees and certain of their employees represented by the Brotherhood of Locomotive Engineers, Brotherhood of Locomotive Firemen and Enginemen, Order of Railway Conductors and Brakemen, Brotherhood of Railroad Trainmen, and the Switchmen's Union of North America, labor organizations, threatens essential transportation services of the Nation; and
 
 
 89
 Whereas it is essential to the national interest, including the national health and defense, that essential transportation services be maintained; and
 
 
 90
 Whereas all the procedures for resolving such dispute provided for in the Railway Labor Act have been exhausted and have not resulted in settlement of the dispute; and
 
 
 91
 Whereas the Congress find that emergency measures are essential to security and continuity of transportation services by such carriers; and
 
 
 92
 Whereas it is desirable to achieve the above objectives in a manner which preserves and prefers solutions reached through collective bargaining; and
 
 
 93
 Whereas, on August 2, 1963, the Secretary of Labor submitted to the carrier and organization representatives certain suggestions as a basis of negotiation for disposition of the fireman (helper) and crew consist issues in the dispute and thereupon through such negotiations tentative agreement was reached with respect to portions of such suggestions; and
 
 
 94
 Whereas, on August 16, 1963, the carrier parties to the dispute accepted and the organization parties to the dispute accepted with certain reservations the Secretary of Labor's suggestion that the fireman (helper) and crew consist issues be resolved by binding arbitration but the said parties have been unable to agree upon the terms and procedures of an arbitration agreement: Therefore be it
 
 
 95
 Resolved by the Senate and House of Representatives of the United States of America in Congress assembled, That no carrier which served the notices of November 2, 1959, and no labor organization which received such notices or served the labor organization notices of September 7, 1960, shall make any change except by agreement, or pursuant to an arbitration award as hereinafter provided, in rates of pay, rules, or working conditions encompassed by any of such notices, or engage in any strike or lockout over any dispute arising from any of such notices. Any action heretofore taken which would be prohibited by the foregoing sentence shall be forthwith rescinded and the status existing immediately prior to such action restored.
 
 
 96
 Sec. 2 There is hereby established an arbitration board to consist of seven members. The representatives of the carrier and organization parties to the aforesaid dispute are hereby directed, respectively, within five days after the enactment hereof each to name two persons to serve as members of such arbitration board. The four members thus chosen shall select three additional members. The seven members shall then elect a chairman. If the members chosen by the parties shall fail to name one or more of the additional three members within ten days, such additional members shall be named by the President. If either party fails to name a member or members to the arbitration board within the five days provided, the President shall name such member or members in lieu of such party and shall also name the additional three members necessary to constitute a board of seven members, all within ten days after the date of enactment of this joint resolution. Notwithstanding any other provision of law, the National Mediation Board is authorized and directed: (1) to compensate the arbitrators not named by the parties at a rate not in excess of $100 for each day together with necessary travel and subsistence expenses, and (2) to provide such services and facilities as may be necessary and appropriate in carrying out the purposes of this joint resolution.
 
 
 97
 Sec. 3. Promptly upon the completion of the naming of the arbitration board the Secretary of Labor shall furnish to the board and to the parties to the dispute copies of his statement to the parties of August 2, 1963, and the papers therewith submitted to the parties, together with memorandums and such other data as the board may request setting forth the matters with respect to which the parties were in tentative agreement and the extent of disagreement with respect to matters on which the parties were not in tentative agreement. The arbitration board shall make a decision, pursuant to the procedures hereinafter set forth, as to what disposition shall be made of those portions of the carriers' notices of November 2, 1959, identified as 'Use of Firemen (Helpers) on Other Than Steam Power' and 'Consist of Road and Yard Crews' and that portion of the organizations' notices of September 7, 1960, identified as 'Minimum Safe Crew Consist' and implementing proposals pertaining thereto. The arbitration board shall incorporate in such decision any matters on which it finds the parties were in agreement, shall resolve the matters on which the parties were not in agreement, and shall, in making its award, give due consideration to those matters on which the parties were in tentative agreement. Such award shall be binding on both the carrier and organization parties to the dispute and shall constitute a complete and final disposition of the aforesaid issues covered by the decision of the board of arbitration.
 
 
 98
 Sec. 4. To the extent not inconsistent with this joint resolution the arbitration shall be conducted pursuant to sections 7 and 8 of the Railway Labor Act, the board's award shall be made and filed as provided in said sections and shall be subject to section 9 of said Act. The United States District Court for the District of Columbia is hereby designated as the court in which the award is to be filed, and the arbitration board shall report to the National Mediation Board in the same manner as arbitration boards functioning pursuant to the Railway Labor Act. The award shall continue in force for such period as the arbitration board shall determine in its award, but not to exceed two years from the date the award takes effect, unless the parties agree otherwise.
 
 
 99
 Sec. 5. The arbitration board shall begin its hearings thirty days after the enactment of this joint resolution or on such earlier date as the parties to the dispute and the board may agree upon and shall make and file its award not later than ninety days after the enactment of this joint resolution: Provided, however, That said award shall not become effective until sixty days after the filing of the award.
 
 
 100
 Sec. 6. The parties to the disputes arising from the aforesaid notices shall immediately resume collective bargaining with respect to all issues raised in the notices of November 2, 1959, and September 7, 1960, not to be disposed of by arbitration under section 3 of this joint resolution and shall exert every reasonable effort to resolve such issues by agreement. The Secretary of Labor and the National Mediation Board are hereby directed to give all reasonable assistance to the parties and to engage in mediatory action directed toward promoting such agreement.
 
 
 101
 Sec. 7. (a) In making any award under this joint resolution the arbitration board established under section 2 shall give due consideration to the effect of the proposed award upon adequate and safe transportation service to the public and upon the interests of the carrier and employees affected, giving due consideration to the narrowing of the areas of disagreement which has been accomplished in bargaining and mediation.
 
 
 102
 (b) The obligations imposed by this joint resolution, upon suit by the Attorney General, shall be enforcible through such orders as may be necessary by any court of the United States having jurisdiction of any of the parties.
 
 
 103
 Sec. 8. This joint resolution shall expire one hundred and eighty days after the date of its enactment, except that it shall remain in effect with respect to the last sentence of section 4 for the period prescribed in that sentence.
 
 
 104
 Sec. 9. If any provision of this joint resolution or the application thereof is held invalid, the remainder of this joint resolution and the application of such provision to other parties or in other circumstances not held invalid shall not be affected thereby.
 
 
 105
 Approved August 28, 1963.
 
 SUPPLEMENTAL OPINION
 
 106
 On May 12, 1967, this court released its opinion disposing of many of the legal questions arising from the railway work rules disputes and the compulsory arbitration statute passed by Congress in 1963 to handle the controversies. Because of the number and complexity of the issues, we directed the parties to confer in an effort to propose a judgment embodying our rulings, and invited them to request supplemental rulings on any points not explicitly covered by our opinion.
 
 
 107
 The parties have submitted numerous requests for supplemental rulings, for reconsideration, and for clarification.
 
 
 108
 I The New Plateau Work Rules Continuing in Effect
 
 A. Brotherhood of Railroad Trainmen (BRT)
 
 109
 The carriers contend that our 'new plateau' rationale, holding that the substantive terms effected by Award 282 continue in force after the formal expiration date of the Award until changed pursuant to the Railway Labor Act, logically requires reversal of the District Court's ruling that the procedures established by Award 282 for special arbitration awards on the trainmen issue lapsed at the termination of the Award. We disagree.
 
 
 110
 Our decision rests on an accommodation of the sometimes divergent directives of Public Law 88-108, Award 282, and the Railway Labor Act. Throughout, our touchstone has been our understanding of dominant Congressional intention. We viewed Congressional intervention in 1963, as reflecting a sensitivity to the dangers of imposing drastic changes on the pattern of railway labor collective bargaining.
 
 
 111
 The point is simply this: We think Congress meant that changes in substantive work rules issuing forth after the expiration of Award 282 should not be wrought by the compulsory edict of a board, but should either be reached by agreement of the parties or should be born out of their actions under the Railway Labor Act, an act which regulates their conduct of bargaining so as to promote the possibility of agreement, with the assistance of the National Mediation Board or other special boards.
 
 
 112
 This dominant Congressional intention means that a difference must be drawn between those actions of Board 282 and its agents prior to the expiration date of Award 282 which effected changes in substantive work rules, and those actions which merely constituted issuance of procedures for promulgating future changes in substantive work rules. The completed changes in substantive work rules continue on-- unless and until changed again in accordance with the Railway Labor Act. But there is no continuance of what are in effect only procedures for issuing future changes in substantive work rules.
 
 
 113
 Those procedures constituted a special mechanism for making changes by award, and were intended to have only a two-year life. Upon the expiration of the two-year period the special machinery was exhausted and in the absence of agreement only the system of the Railway Labor Act was available for future changes in substantive work rules. Consequently, in the absence of ratification by agreement of the parties, a local adjustment board had no independent legal authority that would permit it to achieve an alteration in substantive work rules subsequent to the expiration of the two-year period.
 
 
 114
 B. Brotherhood of Locomotive Firemen and Enginemen (BLFE)
 
 
 115
 The parties are in disagreement as to the import for the Firemen of our ruling as to the Trainmen, a ruling announced in our May 12 opinion and adhered to on reconsideration for the reasons noted above.
 
 
 116
 On the firemen issue, Board 282 decided that most firemen could be dispensed with for other than steam power engines. It developed a procedure permitting the 'blanking' of firemen positions as follows: Each carrier could list those engine crews on which it thought firemen unnecessary for reasons of safety or workload. These positions could then be blanked, except that each local union chairman was given the right within 30 days of receipt of the carrier's list to designate up to ten percent of these crews as requiring continued employment of firemen. The Award refers to this right to designation as based upon considerations of safety, undue work burden and adequate and safe service to the public, but provided that the designation shall not be subject to challenge or review. This procedure was designed to take place at three month intervals.
 
 
 117
 A dispute arose when it came time to decide what happened to this procedure, and the results it had reaped, when Award 282 expired.
 
 
 118
 The carriers insisted that when Award 282 expired the procedures continued in effect as part of the new plateau of work rules, and constituted a continuing mechanism for reducing the employment of firemen unless and until changed in accordance with Section 6 of the Railway Labor Act. The BLFE argued both that this procedure passed out of existence when the Award terminated, and that the changes it had effected lapsed, so that positions blanked during the life of the Award were resurrected. The District Court ruled that a 'new plateau' had been created that preserved what had been accomplished by the carriers under the Award in reducing firemen's positions, but held that the carriers could no longer resort to the machinery created by the Award to make further job cuts. The District Court concluded, however, that the carriers were prevented only from taking 'affirmative acts' in reliance on the Award, but explained that this did not prevent the carriers from refusing to fill vacancies resulting from natural attrition. The underlying premise of that court's decision was that Award 282 superseded the requirements of the National Diesel Agreement which would otherwise demand the use of firemen on all locomotives.
 
 
 119
 As set forth in our May 12 opinion, this court has rejected, though for somewhat different reasons, the contention of the BLFE that after March 30, 1966, the status quo ante compulsory arbitration was automatically restored. While we explicitly ruled that the procedure created by the Board for making new crew consist rules expired when the Award did, we did not previously examine the problem presented in the firemen context.
 
 
 120
 The BLFE insists that there is no tenable distinction whereby firemen should be subject to continuing reductions under the Award though trainmen are not similarly affected. The carriers concede that it is difficult to distinguish the two situations, but suggest that the Award might be viewed as merely setting forth a procedure for crew consist changes but as directly affecting the firemen rules.
 
 
 121
 Once again we find both parties somewhat out of alignment with our basic premises. We have endeavored to make it clear that nothing of the Award survived its expiration date. It is the work rules resulting from the Award that endure, by virtue of the Railway Labor Act; they are deemed to be incorporated into the prior agreements of the parties that themselves endure by virtue of the Railway Labor Act unless and until changed in accordance with that statute. We must therefore discern what 'work rules' were put into effect under and prior to the expiration of Award 282.
 
 
 122
 The Award did not dispense with the use of firemen. It began by continuing in force all 'agreements, rules, regulations, interpretations, and practices, however established,' except as modified by the Award. The Award provided procedures whereby the carriers could mark firemen jobs for extinction, and also established a reciprocal power in the local BLFE chairman to immunize from elimination ten percent of the crews listed. The Opinion of the Neutral Members of Board 282 makes abundantly clear that the Board recognized that the Award had the effect only of sanctioning a procedure of limited duration for accomplishing a reduction in crew consist and the use of firemen. The Board explained that it was conscious that the immediate impact of the Award might be small, but that this was a deliberate choice reflecting concern for the human factor in the equation and the goal that the Award would establish some principles that could contribute to a final solution to the problems:
 
 
 123
 The Board's award will remain in force only two years. Within that time the effect of attrition may be such that the number of firemen or train crew jobs actually eliminated may be comparatively small. Opinion of Neutral Members, 41 LAB.ARB. 680, 681.
 
 
 124
 The Board members themselves characterized what they did as having 'established a procedure for determining whether, considering safety, workload, and adequacy of transportation service, particular jobs should be made subject to elimination.' (p. 681). In explaining why the Award provided that the union could insist on saving ten percent of the jobs marked for elimination, the Neutral Members reasoned that this procedure would obviate the possibility of objections, based on safety or convenience, to individual proposals for job reduction. The underlying premises, as explicated by the Board, was that the Award would be able to authorize such reductions only during two years, and unless an efficient procedure were provided for making specific decisions 'the likelihood of reducing (the number of disputes over individual jobs) significantly in a two-year period would not be very great.' (p. 690). Because of the two-year limitation on the Award, the Board doubted that any standards it might prescribe could be applied in particular disputes 'in sufficient time to yield any significant results.' (p. 690).
 
 
 125
 As the event turned out the carriers used the Award's procedures to terminate many more firemen jobs than the Board predicted.[54] The Neutral Members' underestimate does not undercut but rather underlines the view that the mechanics for reduction in firemen jobs were procedures of necessarily limited duration, rather than work rules with continuing vitality.
 
 
 126
 Our conclusion is that the provisions in the Award for establishing new firemen levels did not constitute 'work rules' in the classic sense, as we have used and applied that term, but instead are more accurately described as procedures for establishing new work rules. The history of labor relations agreements in this industry reveals that the manning work rules were expressed in terms of ultimate results, like one-conductor-and-three-brakemen, or firemen-required-on-all-freight-locomotives, and were not formulated in terms of a methodological approach. This practical construction of the concept of work rules is reinforced by the Board's expressions treating the mechanics of lists and designations as procedures. Accordingly, for purposes of determining what 'work rules' were in force on the last day of the life of Award 282, we do not consider the procedures provided by the Award for changing job requirements as being themselves part of the substantive 'work rules.' These procedures, like the procedures for changing substantive work rules for crew consist of trainmen, had no effectiveness after the expiration of the Award.
 
 
 127
 This construction also gives what we consider the appropriate effect to the undeniably significant provisions in Public Law 88-108 and Award 282 that limited the effectiveness of the Award to two years. Since the Award did not become effective for sixth days after filing, the parties had more than two full years to plan its implementation. The preexisting work rules, contained in the National Diesel Agreement of 1950, stipulated that 'A fireman, or a helper, taken from the seniority ranks of the firemen, shall be employed on all locomotives.' Award 282 continued this requirement (and any others stemming from agreement or practice), until changed in accordance with the Award. For two years plus, the carriers had the machinery for proposing, at three month intervals, the crews that they thought could safely and efficiently dispense with firemen positions. The fruits of these notices and negotiations, after adjustment for the Union's ten percent retention, effected what must be regarded as new 'rules' applicable to the particular runs involved. But when the Award expired, so did the procedures it suggested. What survives is the complex of work rules in force on the last day prescribing the substantive terms that controlled the use of firemen on individual runs.
 
 
 128
 In consequence, a carrier is not only prevented from taking 'affirmative acts' under the Award to reduce the use of firemen, as the District Court properly held, but also, if the carrier was required to keep a firemen on a particular crew as of the last day of the Award, it cannot thereafter change the work rule by discontinuing that position, except by agreement or in accordance with Section 6. The work rule that continues in force provides for a fireman on this crew, and that is not changed because the particular fireman on duty dies or retires.
 
 
 129
 Conversely, however, if the work rule in effect on the last day of the Award provided that a fireman was not required for a particular engine crew-- because that crew was included on the carrier's list of proposed blankable jobs and the union's local chairman did not designate it for retention of a fireman, within the ten percent of crews he could control-- the work rule does not require a fireman on that crew even though for one reason or another the carrier had not removed or transferred that fireman by the end of the effective period of the Award.[55] The carrier may thereafter transfer him, or refuse to replace him when he dies or retires. Such action would not constitute a change in work rules but simply an action in accordance with the work rule in force on the critical date, a rule which provided that no fireman was required for that crew.
 
 
 130
 The National Diesel Agreement was not set aside by the Board. As already noted, the opening section of the Award provided that agreements in force continued in effect except as they were modified by the Award. The Award provided a procedure for modifications during the two-year life of the Award. We recognize that it may be turning back the clock to an era that two presidential boards and the Neutral Members of Board 282 have agreed is technologically outdated, but taking into account the structure of Award 282 as issued, we see no alternative to holding that any new runs created after Award 282 are subject to the National Diesel Agreement, and its requirement of a fireman on each engine crew.
 
 
 131
 Moreover, the National Diesel Agreement is in effect even though the only reason why a change in its work rule was not made under the Award during its life time was the fact that the change was blocked by a state's full crew law. The Supreme Court has expressly held that while such state law was in effect the Board had no capacity to make a change contrary to its provisions. See Brotherhood of Locomotive Engineers v. Chicago, Rock I. & Pac. R.R., 382 U.S. 423, 86 S.Ct. 594, 15 L.Ed.2d 501 (1966). The opening sections of the Award dealing with the use of firemen and with crew consists provided for the continuation of work rules, however established, unless changed pursuant to the Award. The repeal of a full crew law subsequent to the expiration of Award 282 came after expiration of the Board's authority under the temporary statute and after expiration of the power of a carrier to invoke the procedures of the Award.
 
 
 132
 The carriers argue in effect that the Award at least authorized the carriers to blank firemen positions during the lifetime of the Award, with this personnel action remaining in a state of suspended animation until its vitalization upon repeal of the full crew law. The Court noted in Rock Island, supra, 382 U.S. at 433, 86 S.Ct. at 599:
 
 
 133
 Congress wanted to do as little as possible in solving the dispute which was before it, and we note that this dispute was not over the size of crews in States which had full-crew laws.
 
 
 134
 The Board authorized the carriers to list jobs for blanking, and thus provide a classification 'when and if such full crew laws are amended or repealed.' Answer of May 17, 1964, to Carriers' Question No. 5 under Section II-- Part B(1) and B(2). But this conditional blanking was only available as an advance procedure made fruitful if the necessary condition materialized during the 2-year lifetime of the Award. See Opinion of Neutral Members, quoted supra, 41 Lab.Arb. at 681. The Board's energy was not limited to 'the dispute which was before it (Congress)' at the passage of the law, but also extended to firemen manning disputes arising during the critical 2-year period. But the Board's order and interpretations cannot be stretched beyond the Congressional frame of reference to resolve academic differences or disputes that were neither in being at the time nor projected as arising during the 2-year period.
 
 
 135
 II Validity of Awards Made January 25, 1966.
 
 
 136
 In one respect we have decided to grant reconsideration and modify our opinion as requested by the carriers. In our opinion of May 12, we held that Award 282 was no longer in existence on January 25, 1966, when a special adjustment board rendered crew consist awards between the BRT and two carriers, and that therefore these awards were without legal significance.
 
 
 137
 We rejected by implication the carriers' argument in brief that the BRT had stipulated to the contrary. On rehearing the carriers point out decisions interpreting statutory provisions that an act be done within a specified period from the date of another action or event so that the initial or trigger date is excluded from the computation. As we were aware, that is of course the modern doctrine and is established by the decisions of this court among others.[56] It is the rule adopted by Rule 6 of the Federal Rules of Civil Procedure. We thought this rule inapplicable because the starting date did not involve problems of a fractional day, and was in turn determined by a still earlier computation beginning with an initial date that was concededly excluded from computation. This led us to the view that the two-year period prescribed by the Act as the life of the Award did not extend beyond 731 full days (two years of 365 days each, plus February 29, 1964), and that the Award which started at 12:01 a.m. on January 25, 1964, should not be stretched to include the 732nd day of January 25, 1966. We felt that in the peculiar setting of this law that legislative consideration should prevail over the customary formula for computing time.
 
 
 138
 On further reflection, we think that while this analysis may be sound for an appraisal of the problem in the first instance, a doctrine not adverted to by the parties preempts the question. There is hornbook learning to the effect that where there is doubtful language in a statute for performance of an act, the courts prefer that which will confirm rather than destroy any bona fide transaction or title. 52 AM.JUR. Time 18 (1944). This is powerfully underscored by the doctrine, highly relevant to modern needs, that where statutes have been entrusted to administrative agencies for implementation, their construction should be given effect unless plainly unreasonable or in conflict with the plain intent of the legislature.
 
 
 139
 Board 282 was keenly aware of the problems it faced in possessing only temporary authority. It purposefully selected a standard for the manning rule for firemen that could practicably be administered within that limited time. When the special board assumed that it had the authority to act on January 25, 1966, it must be presumed to have considered the question carefully and with a view to conforming to the intent of Congress as nearly as it could discern that intent.
 
 
 140
 We note that the Union did not promptly protest the awards as untimely. And further indication that even the Union regarded the time question as at lwast doubtful appears from the fact that their notices used a January 26, 1966 date as the effective date for proposed changes. We acquiesce in the interpretation of this doubtful question by the special board involved, since we cannot say this interpretation was unreasonable or violated any plainly ascertainable legislative intent. Accordingly we honor the board's conclusion that January 25, 1966 was the final day of the Award, and hold that the special arbitration awards rendered on that date were effective.
 
 
 141
 III Applicability of Section 8 of the Norris-La Guardia Act.
 
 A. Brotherhood of Railroad Trainmen (BRT)
 
 142
 Appellant Union seeks a ruling that even assuming the District Court had jurisdiction to issue a restraining order, the issuance of the order reflected error in this case.
 
 
 143
 We are clear that the District Court was correct in holding that it had jurisdiction to enjoin a violation of the Railway Labor Act, and that this jurisdiction was not negatived by or subject to Section 4 of the Norris-La Guardia Act. We affirmed that conclusion in No. 20316, and fully adhere to that ruling.
 
 
 144
 Although the District Court had jurisdiction to issue the restraining order we think it erred in doing so because-- as we subsequently held in our May 12, 1967 ruling-- the complainant carriers had failed to comply with their obligations under the Railway Labor Act. Section 8 of the Norris-La Guardia Act, 29 U.S.C. 108 (1964), provides that a federal court shall not grant a restraining order or injunction in a labor dispute where the complainant 'has failed to comply with any obligation imposed by law which is involved in the labor dispute in question'.
 
 
 145
 The issuance of the restraining order was conditioned on the carriers' posting a bond to make good damages, not to exceed $10,000, sustained by any party wrongfully restrained. We think the Union, which had to obey the injunction or suffer penalties for contempt of court, is entitled to a ruling from this court that vacates an erroneous determination of the District Court, although of course we do not purport to describe what if anything the Union is entitled to collect on the bond.
 
 
 146
 The District Court erred in concluding that because it held, correctly, that the action was not subject to Section 4 of the Norris-La Guardia Act, which would have ousted the court of jurisdiction, it necessarily followed that the 'clean hands' provision of Section 8 of the Norris-La Guardia Act was likewise wholly inapplicable. The Supreme Court has said, speaking through the Chief Justice, that 'there must be an accommodation' of this Act with the Railway Labor Act. Brotherhood of Railroad Trainmen v. Chicago R. & Ind. R.R., 353 U.S. 30, 40, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957). That principle of accommodation means that actions to enjoin violations of the Railway Labor Act may be maintained without regard to Section 4 of the Norris-La Guardia Act, and yet be subject to Section 8 of that Act. That is the conclusion of other courts which have considered the matter,[57] and we agree. The point is, simply that Congress did contemplate actions to effectuate the Railway Labor Act by enjoining violations.[58] That purpose would be utterly defeated if the federal court actions involved were subject to Section 4 of the Norris-La Guardia Act, which had provisions for withholding injunctions in labor disputes reflecting entirely different objectives.
 
 
 147
 On the other hand a ruling that Section 8 of the Norris-La Guardia Act is applicable to actions to enjoin violations of the Railway Labor Act would not trammel but would rather further the effectuation of that Railway Labor Act, for it ensures compliance by complainant carrier or union which cannot seek an injunction until and unless it has discharged the obligations imposed by the Railway Labor Act.
 
 
 148
 It may be that in a particular case the District Court might conclude that the imperatives of the Railway Labor Act override Section 8-- a statutory focusing so to speak of an equity approach whereby lack of clean hands may be overcome by a balancing of interests, particularly where it is the public interest involved. In a particular case the District Court might conclude that the question of the applicability of Section 8 was doubtful, would require time to explore, and that the restraining order should issue forthwith to avoid jeopardizing the Railway Labor Act. Such approaches would recognize that Section 8 of the Norris-La Guardia Act has some applicability, and is a legislative instruction that weighs heavier in the scale than the clean hands doctrine taken merely as a general equity maxim, yet is overborne by requirements of the Railway Labor Act. Here, however, the approach of the District Court was that Section 8 of the Norris-La Guardia Act was completely inapplicable and that was error. In saying that the restraining order was erroneously entered, however, we do not mean that would excuse a contemptuous violation.
 
 
 149
 We have said enough to demonstrate that the approach used by the District Court was erroneous. As we have decided, the complainants lack clean hands and the defendants were not threatening the violation. Therefore, we now rule that the District Court, taking all circumstances into consideration, should permit the Union to recover on the $10,000 bond if indeed it can establish that it sustained ascertainable damage from the issuance of the restraining order.
 
 
 150
 B. Order of Railway Conductors and Brakemen (ORCB)
 
 
 151
 This Union argues that, even assuming its notices of March 23, 1965 were premature (as held in our May 12 opinion), the temporary restraining order against the strike was invalid because Section 8 of the Norris-La Guardia Act prohibits the granting of a restraining order to a complainant 'who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration.'
 
 
 152
 Neither the unclean hands doctrine, nor its crystallization in Section 8 of the Norris-La Guardia Act, operates to deny relief to a complainant merely because it has declined to short-circuit the plan envisaged by Congress for obtaining a durable resolution of vexing questions. Congress contemplated that the parties would resume negotiation after they had garnered experience from actually living with the rules decided upon by the arbitrators after giving 'due consideration to the effect * * * upon adequate and safe transportation service to the public and upon the interests of the carrier and employees'. (See Section 7(a) of Public Law 88-108.) The general requirement in Section 8 for reasonable efforts at negotiation does not contemplate a departure from the assumptions of a specific statutory plan. Therefore, entry of the restraining order was not improper.
 
 
 153
 The Unions have assumed that a full decree will be entered by this court. We think the proper course is to remand for the District Court to enter decrees in accordance with our rulings. We approve its approach on matters drawn into question except as indicated in our opinions.[59] The various judgments and decrees appealed from are accordingly vacated and the causes remanded for the entry of fresh decrees not inconsistent with our opinions.
 
 
 154
 So ordered.
 
 
 
 [1]
 45 U.S.C. 151-163 (1964), as amended, 45 U.S.C. 153 (Supp. II, 1966)
 
 
 [2]
 See generally Comment, The Railway Work Rules Dispute-- A Precedent for Compulsory Arbitration, 14 DE PAUL L.REV. 115 (1964)
 
 
 [3]
 See Whitehouse v. Illinois Cent. R.R., 349 U.S. 366, 371, 75 S.Ct. 845, 99 L.Ed. 1155 (1955), quoted by Fortas, J., dissenting in Transportation-Communication Employees Union v. Union Pac. R.R., 385 U.S. 157, 176 n. 5, 87 S.Ct. 369, 17 L.Ed.2d 264 (1966)
 
 
 [4]
 Brotherhood of Locomotive Engineers v. Chicago, Rock I. & Pac. R.R., 382 U.S. 423, 430, 86 S.Ct. 594, 15 L.Ed.2d 501 (1966)
 
 
 [5]
 45 U.S.C. 156 (1964): Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice. In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon, as required by section 155 of this title, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board
 
 
 [6]
 Brotherhood of Locomotive Engineers v. Galtimore & O.R.R., 372 U.S. 284, 290-291, 83 S.Ct. 691, 9 L.Ed.2d 759 (1963)
 
 
 [7]
 See Message from the President of the United States Relative to Railroad-Labor Dispute, H.R. Doc. No. 142, 88th Cong., 1st Sess. (1963)
 
 
 [8]
 S.J.Res. 102, 88th Cong., 1st Sess. (1963), U.S.Code Cong. & Admin.News, 1963, p. 833
 
 
 [9]
 Brotherhood of Locomotive Engineers v. Chicago, Rock I. & Pac. R.R., supra note 4, 382 U.S. at 432, 86 S.Ct. 598
 
 
 [10]
 The measure was somewhat analogous to the legislative intervention in a 1916 rail dispute when Congress decreed that eight hours was to be the measure for a standard day in determining compensation, and forbade reduction in the standard day's wage until thirty days after findings were announced by a special commission created to study this system, to report back in six-to-nine months. The Supreme Court upheld this statute, characterizing it as a form of compulsory arbitration that was 'limited' to a 'reasonable period' fixed by the statute. See Wilson v. New, 243 U.S. 332, 345, 346, 351, 37 S.Ct. 298, 61 L.Ed. 755 (1917); Message from the President, supra note 7, at 4-5; S.Rep.No. 459, 88th Cong., 1st Sess. 8 (1963), U.S.Code Cong. & Admin.News 1963, p. 833
 
 
 [11]
 The parties and the District Court have all accepted and implemented the Award as effective January 25, 1964. With that date marking the first day of the two=year period it is clear that the full two-year period expired at the end of January 24, 1966. We see no valid basis for the assumption of the District Judge that the Award was in existence on January 25, 1966. It may be regrettable, but we consider the Award rendered on January 25, 1966, by a special board of adjustment with respect to a dispute between BRT and the Green Bay & Western Railroad Co. and Kewanee, Green Bay & Western Railroad Co. to be without legal significance, unless it has been adopted by agreement of the parties, a question not before us
 
 
 [12]
 One judge dissented on the ground that the constitutional issues should have been referred to a three-judge district court
 
 
 [13]
 These actions were largely concerned with the proper construction of the statute or award in regard to individual fact situations. See, e.g., Brotherhood of Railroad Trainmen v. Certain Carriers, etc., 121 U.S.App.D.C. 230, 349 F.2d 207 (1965); Brotherhood of Railroad Trainmen v. Chicago, M., St. P. & Pac. R.R., 120 U.S.App.D.C. 295, 345 F.2d 985 (1965); Atchison, T. & S.F.Ry. v. Brotherhood of Railroad Trainmen, 324 F.2d 899 (7th Cir. 1963); In re Certain Carriers, etc., 231 F.Supp. 519 (D.D.C.1964); Brotherhood of Railroad Trainmen v. Missouri Pac.R.R., 230 F.Supp. 197 (E.D.Mo.1964); In re Certain Carriers, etc., 229 F.Supp. 259 (D.D.C.1964)
 
 
 [14]
 Appeal No. 20316, Brotherhood of Locomotive Firemen and Enginemen (and H. E. Gilbert) v. Bangor & A.R.R., 127 U.S.App.D.C. 23, 380 F.2d 570, arises from an adjudication of contempt for violating a temporary restraining order. Although it was argued together with these cases, it presents different questions and is being considered separately. See Bangor & A.R.R. v. Brotherhood of Locomotive Firemen, 255 F.Supp. 476 (D.D.C.1966)
 
 
 [15]
 Compare Manning v. American Airlines, Inc., 329 F.2d 32, 34 (2d Cir.), cert. denied, 379 U.S. 817, 85 S.Ct. 33, 13 L.Ed.2d 29 (1964). See also Manning v. American Airlines, Inc., 221 F.Supp. 301 (S.D.N.Y.1963)
 
 
 [16]
 National Woodwork Mfrs. Ass'n v. NLRB, 386 U.S. 612, 649, 87 S.Ct. 1250, 1271, 18 L.Ed.2d 357 (April 17, 1967)
 
 
 [17]
 Manning v. American Airlines, Inc., supra note 15, 329 F.2d at 34
 
 
 [18]
 See note 10 supra
 
 
 [19]
 Indeed, on the crew consist issue, Section III.A(1) of the Award remanded the dispute to local properties 'for negotiation,' and only if these further efforts to reach a settlement proved pointless were special boards of adjustment to be convened to fix the temporary rules
 
 
 [20]
 See Message from the President, supra note 7, at 6-8
 
 
 [21]
 Chairman of the National Railway Labor Conference, an organization whose members conduct about ninety percent of all railway operations in the United States
 
 
 [22]
 Hearings on S.J.Res. 102, Before the Senate Comm. on Commerce, 88th Cong., 1st Sess., ser. 24, at 375 (1963)
 
 
 [23]
 The Supreme Court referred to this substtitution as the only 'significant change' from the Administration bill. Brotherhood of Locomotive Engineers v. Chicago, Rock I, & Pac, R.R., supra note 4, 382 U.S. at 432, 86 S.Ct. at 598
 
 
 [24]
 See S.Rep.No. 459, 88th Cong., 1st Sess. 9 (1963); H.R.Rep.No. 713, 88th Cong., 1st Sess. 12-13 (1963) U.S.Code Cong. & Admin.News 1963, p. 833; Brotherhood of Locomotive Firemen and Enginemen v. Chicago, B. & Q. R.R., 225 F.Supp. 11, 18 (D.D.C.), aff'd, 118 U.S.App.D.C. 100, 331 F.2d 1020, cert. denied, 377 U.S. 918, 84 S.Ct. 1181, 12 L.Ed.2d 187 (1964)
 
 
 [25]
 S.Rep.No. 459, 88th Cong., 1st Sess. 10 (1963); see H.R.Rep.No. 713, 88th Cong., 1st Sess. 14-15 (1963); U.S.Code Cong. & Admin.News 1963, p. 833
 
 
 [26]
 See ELKOURI & ELKOURI, HOW ARBITRATION WORKS 30-47 (rev. ed. 1960)
 
 
 [27]
 Sheehy, Ch. J., in Brotherhood of Railroad Trainmen, etc. v. St. Louis Sw. Ry., 220 F.Supp. 319, 325 (E.D.Tex.1963)
 
 
 [28]
 McMullans v. Kansas, O. & G. Ry., 229 F.2d 50, 56 (10th Cir.), cert. denied, 351 U.S. 918, 76 S.Ct. 710, 100 L.Ed. 1450 (1956)
 
 
 [29]
 See Detroit & T.S.L.R.R. v. Brotherhood of Locomotive Firemen, 357 F.2d 152, 153 (6th Cir. 1966)
 
 
 [30]
 Brotherhood of Railway & S.S. Clerks, etc. v. Florida E.C. Ry., 384 U.S. 238, 246, 86 S.Ct. 1420, 1424, 16 L.Ed.2d 501 (1966). See also Farmer, Compulsory Arbitration-- A Management Lawyer's View, 51 VA.L.REV. 396, 401-02 (1965)
 
 
 [31]
 See, e.g., Order of Railroad Telegraphers v. Chicago & N.W. Ry., 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774 (1960). We do not consider attempts to obtain new work rules incompatible with those imposed by the Award or with the report of the Presidential Emergency Board reflective of bad faith on the part of the unions. Compare Pullman Co. v. Order of Railway Conductors, 316 F.2d 556 (7th Cir.), cert. denied, 375 U.S. 820, 84 S.Ct. 57, 11 L.Ed.2d 54 (1963)
 
 
 [32]
 The District Opinion is reported: Akron & B. Belt R.R. v. Order of Railway Conductors, 253 F.Supp. 538 (D.D.C.1966)
 
 
 [33]
 The carriers lodged a further objection on the ground that the ORCB is not the certified bargaining representative of most of the road brakemen directly affected by the notices. Compare Southern Pac. Co. v. Switchmen's Union of North America, 356 F.2d 332, 335 (9th Cir. 1965). The parties have stipulated this issue out of these proceedings
 
 
 [34]
 See American Airlines Inc. v. Air Line Pilots Ass'n, supra, 169 F.Supp. at 793-795
 
 
 [35]
 See Elgin, J. & E. Ry. v. Burley, 325 U.S. 711, 722-728, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945)
 
 
 [36]
 These are appeals from judgments following the opinions in Akron & B. Belt R.R. v. Brotherhood of Railroad Trainmen, 250 F.Supp. 691; 252 F.Supp. 207, and 254 F.Supp. 306 (D.D.C.1966)
 The Switchmen's Union of North America (SUNA) is also a party in Appeals 20152 and 20172.
 
 
 [37]
 'Either party in interest shall give written notice of any proposed change in any such stipulated number of trainmen. * * * The time and place for the beginning of conferences between the representatives of the parties in interest with respect to such proposed change or changes shall be agreed upon within 10 days after the receipt of said notice, and said time shall be within 15 days after the receipt of said notice.'
 
 
 [38]
 These are appeals from judgments following the opinion in Bangor & A.R.R. v. Brotherhood of Locomotive Firemen, 253 F.Supp. 682 (D.D.C.1966)
 
 
 [39]
 Bangor & A.R.R. v. Brotherhood of Locomotive Firemen, supra note 38, 253 F.Supp. at 687
 
 
 [40]
 Accord, Elgin, J. & E. Ry. v. Burley, supra note 35, 325 U.S. at 724-725, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945)
 
 
 [41]
 See also 45 U.S.C. 152, Seventh (1964)
 
 
 [42]
 Order of Railroad Telegraphers v. Railway Express Agency, Inc., 321 U.S. 342, 346, 64 S.Ct. 582, 585, 88 L.Ed. 788 (1944)
 
 
 [43]
 United Indus. Workers of Seafarers Int'l Union, etc. v. Board of Trustees of Galveston Wharves, 351 F.2d 183, 191 (5th Cir. 1965)
 
 
 [44]
 Cf. Fibreboard Paper Prod. Corp. v. NLRB, 379 U.S. 203, 209-215, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964)
 
 
 [45]
 See H.R.Rep.No. 713, 88th Cong., 1st Sess. 6 (1963); Comment, The Railway Work Rules Dispute-- A Precedent for Compulsory Arbitration, 14 DE PAUL L. REV. 115, 119-20 (1964). See also Brotherhood of Locomotive Engineers v. Chicago, Rock I. & Pac. R.R., supra note 4, 382 U.S. at 429, 86 S.Ct. 594, 15 L.Ed.2d 501
 
 
 [46]
 See the excellent discussion in Weber, Public Policy and the Scope of Collective Bargaining, 13 LAB.L.J. 49 (1962)
 
 
 [47]
 Bangor & A.R.R. v. Brotherhood of Locomotive Firemen, supra note 38, 253 F.Supp. at 668
 
 
 [48]
 We note, however, that apparently 6000 fewer firemen would have been required under the proposed rules than the National Diesel Agreement had provided
 
 
 [49]
 See Southern Pac. Co. v. Switchmen's Union of North America, supra note 33, 356 F.2d at 334-335
 
 
 [50]
 45 U.S.C. 158(m) (1964)
 
 
 [51]
 See Brotherhood of Railroad Trainmen v. Terminal R.R. Ass'n, 127 U.S.App.D.C. 37, 380 F.2d 584 (No. 20135), decided this day
 
 
 [52]
 The BLFE contends in its brief that there is nothing wrong with retroactive contract proposals and agreements, and suggests that they are used frequently in industrial relations. Whatever may be the general practice, and regardless of what other provisions of the Railway Labor Act may require, there is no duty to bargain collectively over the settlement of past grievances that is imposed by Section 6
 
 
 [53]
 This court's opinions in the instant cases will undoubtedly have bearing on others arising in one way or other out of Award 282
 Before the present division are ten cases, Nos. 20152, 20158, 20172, 20191, 20192, 20193, 20215, 20216, 20229 and 20249.
 Before the instant division also is No. 20316, 127 U.S.App.D.C. 23, 380 F.2d 570, decided today.
 Previously argued before Judges Bastian, Burger and Wright are five cases, Nos. 19867, 2003, 2004, Brotherhood of Railroad Trainmen v. Chicago, M., St. Paul & P.R. Co., 127 U.S.App.D.C. 58, 380 F.2d 605, 20212 and 20213, Brotherhood of Railroad Trainmen v. St. Louis Southwestern Ry. Co., 127 U.S.App.D.C. 56, 380 F.2d 603.
 Case No. 20135, 127 U.S.App.D.C. 37, 380 F.2d 584, decided today, came before Chief Judge Bazelon, Senior Circuit Judge Edgerton and Circuit Judge Coffin, (of the First Circuit, sitting by designation).
 Hitherto in the District Court, cases involving the railway work rules disputes have been referred to a single District Judge. The fact that we have differed from him in some aspects of relief granted or of the basis of rulings should not be permitted to obsecure our appreciation for the prodigious effect he has made in response to so difficult an assignment, and for the commendable manner in which he has approached so many novel and complex questions.
 In today's text we have undertaken definition of the basic legal principles applicable to future consideration of the issues. It would seem that sound judicial administration of the District Court's business will be served by rotation of this assignment at this juncture. We have in mind avoidance of further burdening of this District Judge and the broadening of application of pertinent judicial expertise and exposure in meeting our common problems in this area. So it is that we have ourselves achieved some distribution of the workload, and we regretfully assume that there may yet be heavy demands on judicial manpower in the District Court by reason of railroad work rules controversies.
 
 
 [54]
 In the course of Congressional testimony, Chairman Ralph Seward of Board 282 and Assistant Secretary of Labor James Reynolds indicated that their original expectation was that the procedures would lead to a reduction of about 5500 jobs, rather than the 18000 the carriers succeeded in blanking. See Hearings on the Administration of Public Law 88-108 Before the Senate Comm. on Commerce, 89th Cong., 1st Sess., ser. 89-45 at 363-64, 465-66 (1965). And according to Senator McGee, the number of firemen eliminated also exceeded the expectations of 'Members of the U.S. Senate.' Hearings on the Administration of Public Law 88-108 Before the Senate Comm. on Commerce, 89th Cong., 2d Sess., ser. 89-56, at 1030 (1966)
 
 
 [55]
 The work rules effectuating the changes made under the Award included the ancillary protective provisions of Part II.C for individuals transferred or separated in implementing the change. These work rules continued in effect after the Award
 
 
 [56]
 E.g., Freeman v. Pew, 61 App.D.C. 223, 59 F.2d 1037 (1932); Burnet v. Willingham Loan & Trust Co., 282 U.S. 437, 439-440, 51 S.Ct. 185, 75 L.Ed. 448 (1931); Prince v. United States, 185 F.Supp. 269, 271-272 (E.D.Wis.1960)
 
 
 [57]
 See Rutland Ry. Corp. v. Brotherhood of Locomotive Eng'rs, 307 F.2d 21, 37-40 (2d Cir. 1962), cert. denied, 372 U.S. 954, 83 S.Ct. 949, 9 L.Ed.2d 978 (1963); Chicago, Rock I. & Pac. R.R. v. Switchmen's Union, 292 F.2d 61, 64-66 (2d Cir. 1961), cert. denied, 370 U.S. 936, 82 S.Ct. 1578, 8 L.Ed.2d 806 (1962); Elgin, J. & E. Ry. v. Brotherhood of Railroad Trainmen, 302 F.2d 540, 544-545 (7th Cir.), cert. denied, 371 U.S. 823, 83 S.Ct. 42, 9 L.Ed.2d 63 (1962); Manning v. American Airlines, Inc., 221 F.Supp. 301, 304-306 (S.D.N.Y.1963); cf. Brotherhood of Railroad Trainmen v. Toledo, P. & W.R.R., 321 U.S. 50, 60-65, 64 S.Ct. 413, 88 L.Ed. 534 (1944); Brotherhood of Railway & S. S. Clerks, etc., v. Florida E.C. Ry., 384 U.S. 238, 247 n. 8, 86 S.Ct. 1420, 16 L.Ed.2d 501 (1966); Brotherhood of Railroad Carmen, etc. v. Chicago & North Western Ry., 354 F.2d 786, 794-796 (8th Cir. 1965)
 
 
 [58]
 Virginian Ry. v. System Federation No. 40, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937)
 
 
 [59]
 We affirm both the reasoning and result reached by the District Court in construing the effect of the agreements entered into between the BRT and the Kansas City Southern Railway and Louisiana & Arkansas Railway, and the Wichita Terminal Association. We agree that the correspondence between the BRT and the Richmond, Fredericksburg & Potomac Railroad constituted a crew consist agreement of the same duration as an award by a special adjustment board
 We also approve the District Court's holding that Southern Railway Company and its subsidiaries were proper parties plaintiff in suits involving the ORCB and were covered by Award 282.