**BROTHERHOOD OF LOCOMOTIVE FIREMEN AND ENGINEMEN,** Plaintiff,

v.

The **DETROIT AND TOLEDO SHORE LINE RAILROAD COMPANY,** Defendant.

No. C 68–36.

United States District Court
N. D. Ohio, W. D.

Dec. 13, 1968.

Richard Colasurd, Toledo, Ohio, for plaintiff.

John M. Curphey, Toledo, Ohio, for defendant.

## OPINION

DON J. YOUNG, District Judge.

For a number of years prior to February 8, 1968, the defendant, in compliance with the Ohio full crew laws, carried a fireman on its through trains to a point just north of the Ohio-Michigan border, as Michigan does not have a full crew law which required them to remain on the trains. The fireman would either wait at that point to board a southbound train, or return to the yard office. Firemen were assigned to these runs, which were about two miles long, from the extra board.

Shortly before February 8, 1968, the defendant had completed a program of rebuilding its Lang yard into a modern, remote control "hump" yard, and in the process had added two more tracks running northward almost to the Ohio-Michigan border. It then renumbered all the tracks as switch tracks, and declared that the switch yard extended to the border, and the main tracks ran beyond that point.

On this basis, the Ohio full crew laws would not require the use of a fireman, since firemen are not required on local or through trains until they enter the main tracks, although they are required on switch engines.[1] The defendant then abolished the job assignments for firemen on the trains to and from the Ohio-Michigan border. The plaintiff thereupon commenced this action to enjoin the defendant from abolishing these job assignments without complying with Section 2, Seventh and Section 6 of the Railway Labor Act.[2]

---

1. Ohio Revised Code §§ 4999.07, 4999.08.

2. 45 U.S.C. § 152, Seventh, and 45 U.S.C. § 156. Section 152, Seventh, provides as follows:
   "No carrier, its officers, or agents shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in section 156 of this title."

The defendant asserts a number of justifications for its actions, or reasons that the Court lacks jurisdiction, all of which are countered by the plaintiff.

In the first place, it ought to be understood that basically the dispute here is one that is most irritating to lay people. Full crew laws are valid and constitutional,[3] and as such, they should be obeyed without question. However, to insist that they be so rigidly enforced that trains must be stopped and started, and men required to get on and off, and to wait around for long intervals between runs which are less than two miles long is absurd in reality, and closely approaches in law the point of application of the maxim *"De minimis non curat lex."* The Court recognizes, however, that the long history of difficulties between these parties makes impossible any other course than a strict adherence to the letter of the law. The conduct of the parties over the years has made it highly unlikely that either can unbend even slightly. Since a trial court must deal with things the way they are, rather than the way they should be, the problems presented in this case must be resolved strictly in accordance with law.

Briefly stated, the contentions of the defendant are that when a new contract was negotiated between the parties in 1953, it completely superceded all former contracts, including the Eastern Diesel Agreement of 1943, which required the defendant to maintain firemen in diesels; that arbitration Award 282 enabled the defendant to abolish these positions, with limited exceptions, and it did do so, with respect to the runs in question, but the Ohio full crew law prevented this abolition from becoming effective; that the reconstruction of the switch yards made the Ohio full crew law no longer applicable to these runs, and defendant was thus at liberty to abolish them; and that the dispute involved here involves interpretation of the terms of the contract between the parties, and hence is a "minor dispute" over which this Court has no jurisdiction.

■ Considering these matters in the order above presented, it is the Court's conclusion that the Eastern Diesel Agreement of 1943 was not superceded by the new general contract of 1953, but continues to be, and still is, in force between the parties. The fact that it was specifically included in the 1943 agreement, but not in the 1953 agreement, is of little probative value on this point, nor is the list of agreements remaining in effect after the 1953 agreement which is attached as a last page to D. ex. 14, particularly since this document does not purport to be anything more than a list, is undated, and the parties signing do not set forth their official positions.

The Eastern Diesel Agreement is by its terms a self-perpetuating and continuing agreement. It deals with one of the most serious controversies in the whole realm of labor law, in which the unprecedented Congressional action was taken which lead to Award 282. To suggest that such an agreement could be' terminated by mere silence or failure to refer to it is totally illogical. Such an argument has as an inescapable tenet that the Washington Job Protection Agreement of 1936 was also terminated in 1953 by reason of non-mention in that later agreement.

Of importance, too, on this issue is the fact that the defendant continuously sought, years after the execution of the 1953 agreement, to get rid of its obligations under the Eastern Diesel Agreement. If it were no longer in effect between the parties, why take action to eliminate it? That the parties continued to treat it as being in force after the 1953 agreement is shown, for example, by the episode of the hiring and discharge of fireman Abrams. (R. 181, 220–221) This Court finds that the 1943 Diesel Agreement, as well as the 1936 Washington Job Protection Agreement,

3. Brotherhood v. Chicago, R. I. & P. Ry. Co., 393 U.S. 129, 89 S.Ct. 323, 21 L.Ed.2d 289 (1968) (11–19–68).

were not terminated in 1953, but are instead currently in full force and effect.

■ The contention that the defendant abolished these firemen's positions under Award 282, but the abolition was not effective because of the Ohio full crew law, remaining suspended until the completion of the yard reconstruction in early 1968, must fail as a matter of law. The law is now clear that when the term for action under Award 282 ended in March, 1966, that was the end of any further changes. Unless the full crew laws were repealed or rendered ineffective within the award period, thus making those job blankings which had been suspended because of the full crew laws effective within the period, the suspended blanking would not become effective afterwards. Brotherhood of Railroad Trainmen v. Akron & B. B. Ry. Co., 128 U.S.App.D.C. 59, 385 F.2d 581 (1967), cert. denied Brotherhood of Locomotive Firemen and Enginemen v. Bangor and Aroostock R. Co., 390 U.S. 923, 88 S.Ct. 851, 19 L.Ed.2d 983 (1968). Any changes in the existing agreements with respect to the composition of train crews must therefore be accomplished within the framework of 45 U.S.C. § 156, if these changes are sought after March 30, 1966, when Award 282 expired. 385 F.2d 581, 593.

On this point the case presents a considerable factual issue as to whether the reconstruction of the switch yard actually moved the beginning point of the defendant's main line north beyond the Ohio-Michigan border. It is not necessary to pass upon this factual dispute, since the legal basis for raising it does not exist, but the Court is inclined to think that a preponderance of the evidence demonstrated only that some additional side tracks were built along the old main tracks. The important reconstruction was south of the Ottawa River. The changing of nomenclature and numbering, and perhaps some slightly different usage of the tracks, hardly seems enough to rob the tracks of their characteristic of being the main tracks, but this factual issue is not decided.

The final contention here is that the fundamental dispute is merely one of interpretation of conflicting contract provisions, and this is a "minor dispute" over which this Court has no jurisdiction.[4] In spite of the temptation for a busy court to adopt this contention, and thus get rid of a difficult case, a different conclusion must be reached.

The defendant, in advancing this argument, seems to take the position that the conflict in this area involves the interpretation of the provisions of the 1953 agreement and the Eastern Diesel Agreement. This argument, however, is totally inconsistent with defendant's claim that the Eastern Diesel Agreement is no longer effective between the parties, which is the real issue in this case.

■■ The issue is not whether there is a conflict of interpretation of the terms of an agreement, but whether or not there is an agreement between the parties, and this issue causes the dispute to be characterized as "major."[5] Since the Eastern Diesel Agreement has been found to be in effect between the parties, under its terms the defendant clearly cannot unilaterally abolish the firemen's positions on these short runs to the Ohio-Michigan border. Therefore, the defendant must proceed in accordance with 45 U.S.C. § 156, or it violates 45 U.S.C. § 152, Seventh, and it may properly be restrained from failing or refusing to do so.[6]

4. 45 U.S.C. § 153, First (i).

5. Cf. Southern Railway Co. v. Brotherhood of Locomotive Firemen & Enginemen, 127 U.S.App.D.C. 371, 384 F.2d 323 (1967); Elgin, J & E Ry. Co. v. Burley, 65 S.Ct. 1282, 89 L.Ed. 1886, 325 U.S. 711 (1945).

6. Brotherhood of Railroad Trainmen v. Chicago R. & I. Ry. Co., 353 U.S. 30, 40–41, 77 S.Ct. 635, 1 L.Ed.2d 622 (1956); Virginian Ry. Co. v. System Federation No. 40, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937).

Nor can the defendant's refusal to abide by the agreement be considered not to cause irreparable injury. The vital matter in such disputes as this is that they be handled within the framework of law, which is the only practical way to industrial peace. The destruction or disturbance of peace in this area unquestionably inflicts irreparable injuries upon all those involved in it.

For all of these reasons, an injunction will be issued as prayed for. Counsel for plaintiff may prepare and submit to opposing counsel a form of order expressive of this ruling. If counsel cannot agree as to the form of the order, counsel for both sides may submit forms of order, and the Court will thereafter fix and enter an order. This opinion will serve as the Court's findings of fact and conclusions of law.