**BANGOR AND AROOSTOOK RAILROAD COMPANY et al., Plaintiffs,**

v.

**BROTHERHOOD OF LOCOMOTIVE FIREMEN AND ENGINEMEN, Defendant.**

**BROTHERHOOD OF LOCOMOTIVE FIREMEN AND ENGINEMEN, Plaintiff,**

v.

**The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY et al., Defendants.**

Civ. A. Nos. 777–66, 784–66.

United States District Court, District of Columbia.

Jan. 16, 1970.

Joseph L. Rauh, Jr., and Isaac N. Groner, Washington, D.C., for the Brotherhood.

Francis M. Shea, and Richard T. Conway, Washington, D.C., for the carriers.

## OPINION

CORCORAN, District Judge.

These consolidated cases continue the long-standing dispute between the railroads and various railroad unions as to the manpower required to be employed in the movement of freight following the termination of Arbitration Award 282 which had the effect of modifying the operation of the National Diesel Agreement of 1950.

On May 12, 1966 the late Judge Alexander Holtzoff entered judgments in these cases, Bangor & Aroostook Railroad v. Brotherhood of Locomotive Firemen, 253 F.Supp. 682 (D.D.C. 1966), and cross appeals were taken to the United States Court of Appeals for the District of Columbia. The Court of Appeals disposed of the major disputes between the carriers and the unions, affirming in part and reversing in part the judgments of Judge Holtzoff. Brotherhood of Railroad Trainmen v. Akron & B.B. R. Co., 128 U.S.App.D.C. 59, 385 F.2d 581 (1967), cert. den., 390 U.S. 923, 88 S.Ct. 856, 19 L.Ed.2d 983 (1968). It then remanded the case to the District Court to enter judgment in accordance with its rulings. Judge Holtzoff thereupon, on May 29, 1968, reaffirmed his judgment "as modified by the opinions and judgments of the United States Court of Appeals for the District of Columbia."

However, in its so-called "supplemental opinion" the Court of Appeals had remarked:

"The National Diesel Agreement was not set aside by the Board. As already noted, the opening section of the Award provided that agreements in force continued in effect except as they were modified by the Award. The Award provided a procedure for modifications during the two-year life of the Award. We recognize that it may be turning back the clock to an era that two presidential boards and the Neutral Members of Board 282 have agreed is technologically outdated, but taking into account the structure of Award 282 as issued, we see no alternative to holding that any *new runs* created after Award 282 are subject to the National Diesel Agreement, and its requirement of a fireman on each engine crew." Brotherhood of Railroad Trainmen v. Akron & B. B. R. Co., *supra,* 128 U.S.App.D.C. at 89, 385 F.2d at 611 (Emphasis added).

The phrase "new run" is not known to the railroad industry as a term of art. The carriers, recognizing the ambiguity, filed a motion for supplemental relief against the Brotherhood of Locomotive Firemen and Enginemen (BLF&E). That motion asked Judge Holtzoff to clarify his amended judgment (which of necessity embraced the judgment of the Court of Appeals) as to what was meant by the term "new runs."

Judge Holtzoff, in turn, suggested that the interpretation of the phrase could be best explored in the Court of Appeals where it had originated, and he granted a stay to permit an application to the Court of Appeals. The Court of Appeals, however, ruled:

"The Court is of the view that the case does not warrant revision of its outstanding opinions or mandates, and that the interpretation and application of these opinions to the fact situations now presented should be determined by the District Court in the first instance."[1]

The BLF&E thereupon filed a motion for interim injunction and permanent injunctive relief to compel the carriers to man certain runs with firemen under the Brotherhood's definition of "new runs." Accordingly there are now pending before this Court the BLF&E motion for injunctive relief and the carrier's motion for supplemental relief, both of which depend upon a definition of "new runs."[2]

There is no need to recall the detailed historical background that led to the creation of the Arbitration Board which issued Award 282. That detail has been amply set forth in the Court of Appeals decision. Brotherhood of Railroad Trainmen v. Akron & B.B. R. Co., *supra,* 128 U.S.App.D.C. at 66–70, 385 F.2d at 588–592. Suffice it to say here that in the face of a threatened nationwide rail

---

1. Per Curiam order at 3, Brotherhood of Locomotive Firemen and Enginemen v. Bangor & Aroostook R R Co., Nos. 20,-192, 20,193, 20,215, 20,216 (D.C.Cir. Oct. 23, 1969).

2. In reaching its decision the Court was aided by the voluminous briefs, affidavits and exhibits presented by both sides. These included the following: (1) all the papers filed in the Court of Appeals and then refiled in the District Court—Carriers' Motion to Recall Mandate and Clarify Opinion and Judgment, the BLF&E Response to Carriers Motion, Reply by the carriers to the BLF&E's response, and the Supplemental Memorandum for BLF&E; Affidavit of John P. Heltz, Jr., Exhibits to the affidavit of John P. Heltz, Jr., Affidavit of J. L. Shattuck, Exhibits to Affidavit of J. L. Shattuck, Supplemental Affidavit of John P. Heltz, Jr. (2) Carriers' Motion for Supplemental Relief Against the Brotherhood of Locomotive Firemen and Enginemen, Answer by Brotherhood of Locomotive Firemen and Enginemen, Answer by BLF&E to Carriers' Motion, Carriers' Reply to BLF&E's answer. (3) BLF&E "Motion for Interim Injunction and Permanent Injunctive Relief to Secure Firemen Manning on New Runs" which included Motion for Interim Injunctive Relief filed in Court of Appeals, and Affidavits, Carriers' Response to BLF&E's Motion, Reply Memorandum of BLF&E.

The total volume of paper submitted reached beyond 1000 pages.

strike Congress created the Board and gave it broad authority to establish standards and procedures concerning manpower needs. Award 282 as issued by the Board provided that all firemen in freight and yard services, except to the extent of 10% of the runs, could be dispensed with as unnecessary during the two-year period of the Award. During that two-year period the effectiveness of the National Diesel Agreement, which had been previously controlling, was suspended.

The Award provided that each carrier could list the pool and regularly assigned freight and yard engine crews in each seniority district on which firemen were to be eliminated and the local union chairmen could veto 10% of the crews so listed. In order not to create mass unemployment the Board protected firemen who had more than two years seniority. The details of the protective provisions are not germane to this case.

Prior litigation has dealt with the problem of what occurred, legally, when the Award expired.[3]

The Court of Appeals, adopting the views of Judge Holtzoff,[4] held that Award 282 created a "new plateau" of work rules in effect as of the date of its expiration and that this "new plateau" could be changed only by mutual agreement of the parties or by proceedings under the Railway Labor Act initiated by notices under Section 6 of that statute. 45 U.S.C. §§ 151–163 (1964), as amended, 45 U.S.C. § 153 (Supp.II, 1966).

However, notwithstanding the creation and recognition of the "new plateau" of work rules, the Court of Appeals supplemental opinion quoted above reinstates the National Diesel Agreement where "new runs" are involved, i. e., it requires that firemen must be employed on those "new runs."

As noted, "new run" is not a phrase of art in the railroading industry and neither the carriers nor the union pretend to have any fixed idea as to what is embraced within that phrase.

The carriers urge that the "new run" holding has no application to any pool or regularly assigned freight engine crew or any regularly assigned yard engine crew, which was in existence at any time during the effective period of Section II of the Award. They ask the Court to hold that seasonal changes or other changes such as designation of starting times, hours or days of operation, total mileage, route covered, and starting or ending points do not substantially change the essential purpose or function of the operation as to make it a "new operation having no direct causal relationship to an operation in existence during the effective period of * * * the Award * * * "[5]

The key to the carriers' approach may be embraced in the phrase "level of operation." This means that a new run is created only when the active number of freight and yard crews exceeds the maximum number listed by the carriers in each seniority district during the period of the Award. It means too that even if the maximum number listed is exceeded, but all the runs had been listed at some time during the period of the Award, then a new run has not been created. The carriers relate this level of operation approach to the Award which established new firemen levels for pool and regularly assigned crews, urging that once a run was listed it fell under the work rules provisions of the Award which, as pointed out, continued in force after the Award's termination.

The BLF&E seeks a much broader definition of "new runs." The BLF&E would include as "new runs" any freight

3. In general see Brotherhood of Railroad Trainmen v. Akron & B. B. R. Co., *supra*, 128 U.S.App.D.C. at 59, 385 F.2d at 581 and the opinions of Judge Holtzoff gathered there.

4. Bangor & A. R. R. v. Brotherhood of Locomotive Firemen, *supra*, 253 F.Supp.

at 686. For a detailed explanation of Judge Holtzoff's reasoning see Akron & B. B. R. v. Brotherhood of Railroad Trainmen, 250 F.Supp. 691, 696–698 (D.D.C.1966).

5. Brief on appeal for carriers, at 4.

or yard engine crew operating after the Award which (1) was not operated and listed for veto purposes as of the last day of the Award, or (2) if so operated and listed, commenced operating with such alterations in mileage, hours or other incidents after the Award as to invoke the right to bid under the contract, custom, or practice on each railroad immediately prior to the Award, or (3) was operating during the Award and was abolished during (or after the Award) and subsequently reestablished after the expiration of the Award.

The BLF&E seeks to relate the concept of "new runs" to certain practices within the railroad industry, specifically in regard to the system of seniority bidding for bullentined jobs. The affidavit of Mr. J. L. Shattuck is illuminating in this respect. He points out that firemen are not permanently assigned to permanent jobs. Instead, a complex seniority bidding system exists which permits men to exercise their right to bid their seniority whenever a new crew is assembled for a new run or job. The carriers notify their men of openings for bidding purposes by posting (bulletining) the new jobs.

However, Mr. Shattuck indicated, and counsel for the BLF&E admitted in oral argument, that a great variety exists among bidding practices, contracts, and customs throughout the industry. "* * * [W]hat is deemed a sufficient change in a run to make it a new run on one carrier is not necessarily sufficient on another."[6]

In the resolution of these conflicts the Court feels that it must attempt to devise a definition and lay down guidelines which as nearly as practicable will not only carry out the intent of Congress in creating the Arbitration Board but also the intent of the Court of Appeals in confirming the establishment of the "new plateau" of work rules.

Basically, and subject only to its desire to avoid widespread unemployment, the Arbitration Board aimed toward the elimination of jobs made unnecessary by technological progress in railroading. Judge Holtzoff recognized this general objective when he adopted the "new plateau" theory of work rules that would prevent the reinstatement of the old rules prevalent under the National Diesel Agreement where unnecessary manpower was required to be employed. The Court of Appeals in its ruling adopting the "new plateau" theory likewise sought to prevent retrogression by operation of law to the situation existing prior to the Award.

Looked at in this light, the Court feels that were it to follow the suggestions of the BLF&E the net result would be a gradual but total retrogression into the old system.

For example, the BLF&E suggests that a "new run" is created as to any crew not working on the last day of the Award if that crew is subsequently put into operation. But this would cause innumerable runs to be classed as "new runs" merely because they did not operate on that particular last day either because it was an off day for the crew, or because the train was not scheduled to run on that particular day.

So, too, to relate "new runs" to the bidding procedures would result in linking the definition of "new runs" to the numerous and varying seniority systems prevailing among the carriers. The seniority rules, as the carriers point out, are concerned with which individual fireman is to be used on a given crew (when a fireman is required to be on that crew) rather than with the question as to whether or not a fireman *must* be used on that particular crew.

Regardless of seniority, the work rule governing the situation remains a constant (until changed by agreement) and the work rule established by the "new plateau" is not subject to change by the mere happening of an event giving rise to the right to bid for a job by reason of seniority. On the domino theory that one job vacancy open to bidding creates an-

---

6. Affidavit of J. L. Shattuck, at 5 (filed Nov. 13, 1969).

other, a contrary holding would result in a reversal of much if not all that has taken place under the Award as approved by the Court of Appeals.

In line with this attempt to create a definition which is harmonious with the Congressional intent in creating the Arbitration Board, and with the Court of Appeals' guidelines, the Court leans more to the position suggested by the carriers and would accordingly define a "new run" in these terms:

First, a "new run" is a run that was not listed by the carrier and subject to veto in a particular seniority district at any time during the period of the Award. Thus "new run" has no application to extra crews and crews made up from boards or extra lists not subject to the veto procedure.

Second, a "new run" is a run which exceeds the maximum number of runs listed by the carrier and subject to veto in a particular seniority district during the period of the Award.

Thus, to create a "new run" both of the above criteria must be met.

This basic definition would appear to be consistent with the "new plateau" theory, since as to any run which had been listed at any time during the period of the Award, and had been subject to the Brotherhood's veto, a new work rule was established and that work rule continues to be effective following the termination of the Award under the "new plateau" concept.

It would follow from the foregoing that a temporary discontinuance of any run which had been listed during the period of the Award would not be sufficient to constitute it a "new run," i.e., a "new run" is not created by seasonal stoppages, by changes of crew personnel, by changes in mileage of the run, by changes in the time required, or in the salary paid to the crew. New stops on an old route which do not *substantially* change the route, or new starting or terminal points do not constitute a "new run." A run reinstated after an act of God such as a hurricane, a tornado, or a flood, or a disaster, or a strike, all of which would disrupt or temporarily discontinue rail service, would not constitue a new run.

It is necessary to distinguish between "new crews" or "new crew assignments" and "new runs." Changes in crew assignments arise under the seniority bidding system and the seniority rules determine the order in which an individual fireman can exercise his right to bid on an available crew assignment. They do not, however, determine when an individual fireman must be used on particular crews. The positions of crews change for any number of reasons, and the circumstances giving rise to seniority bidding vary greatly among the seniority districts. The Court avoids this problem of variation by relating its definition of the "new run" to the existence or non-existence of the run during the period of the Award.

Admittedly, this definition is narrow. However, the Court feels the reality of the situation demands such a narrow interpretation. A broad definition would nullify the fundamental holding of the Court of Appeals that a new plateau of work rules was established by the Award and continues in effect until changed in accordance with the Railway Labor Act.

The Brotherhood's motion for permanent injunctive relief is granted in so far as and to the extent that the carriers, consistent with the foregoing definition, are failing to man "new runs" with firemen under the National Diesel Agreement of 1950.