442 F.2d 794
 76 L.R.R.M. (BNA) 2561, 143 U.S.App.D.C. 72,
64 Lab.Cas. P 11,516
 BROTHERHOOD OF LOCOMOTIVE FIREMEN & ENGINEMEN, Appellant,
v.
ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, et al.
BANGOR AND AROOSTOOK RAILROAD COMPANY, et al.,
v.
BROTHERHOOD OF LOCOMOTIVE FIREMEN & ENGINEMEN, Appellant.
 Nos. 23995, 23996.
 United States Court of Appeals, District of Columbia Circuit.
 Argued May 28, 1970.
Decided Feb. 19, 1971.
 
 Mr. Joseph L. Rauh, Jr., Washington, D.C., with whom Messrs. John Silard, Elliott C. Lichtman and Isaac N. Groner, Washington, D.C., were on the brief, for appellants.
 Mr. Francis M. Shea, Washington, D.C., with whom Messrs. Richard T. Conway and James A. Wilcox, Washington, D.C., were on the brief, for appellees.
 Before DANAHER, Senior Circuit Judge, and LEVENTHAL and ROBB, Circuit judges.
 LEVENTHAL, Circuit Judge:
 
 
 1
 In these consolidated cases the ongoing strife between the railroads and the Brotherhood of Locomotive Firemen and Enginemen (BLFE), concerning the fireman manpower required to be employed in the movement of freight, has come to focus on the application of our 1967 Akron opinion 'that any new runs created after Award 282 are subject to the National Diesel Agreement (of 1950), and its requirement of a fireman on each engine crew.' Brotherhood of Railroad Trainmen v. Akron & B.B. R.R., 128 U.S.App.D.C. 59, 89, 385 F.2d 581, 611 (1967), cert. denied, 390 U.S. 923, 88 S.Ct. 851, 19 L.Ed.2d 983 (1968).
 
 Background of Present Controversy
 
 2
 The carriers and the BLFE disagreed as to the consequence of our 1967 ruling and the ensuing judgment.[1] For a time they negotiated upon a new national agreement concerning use of firemen but that proved fruitless. On September 17, 1968, the carriers filed a motion in District Court for supplemental relief, seeking judicial interpretation and approval of the carriers' view of our 'new run' ruling. At the suggestion of District Judge Holtzoff a motion for clarification was filed by the carriers in this court on February 10, 1969.
 
 
 3
 A voluminous file developed in a modern day counterpart to the prolixities of common law pleading. The carriers' 50-page motion was accompanied by a 60-page affidavit, and some 107 pages of exhibits. The BLFE's 30-page 'response' attached an affidavit of 9 pages, and appendices of 280 pages (many of these, however, consisting of single entries of railway system lists). The carriers filed a 'reply' of 35 pages, supplemental affidavit of 24 pages and some 7 pages of exhibits. The BLFE 'supplemental memorandum' was a modest 10 pages.
 
 
 4
 This court called for initial determination by the District Court in the first instance on 'the interpretation and application of these opinions to the fact situations now presented.'[2] The District Court, with Judge Corcoran replacing the late Judge Holtzoff, was presented with the carriers' motion for supplemental relief and a new motion by BLFE for injunctive relief to compel the carriers to man certain runs with firemen in accordance with the BLFE interpretation. The District Court did not take evidence, but disposed of the matter on the basis of the memoranda, affidavits and exhibits that had been filed in this court with some supplementation, principally in the form of extensive oral argument. Its ruling adopted the position of the carriers.
 
 Issues Arising Under New Run Ruling
 
 5
 The application of our 'new run' ruling which appeared in our supplemental Akron opinion of July 31, 1967, requires a restatement of that ruling in its full background.
 
 
 6
 In our initial opinion of May 12, 1967, we broadly reviewed the impact of the work of the Board of Arbitration (Board 282) established pursuant to Public Law 88-108, 77 Stat. 132, passed on August 28, 1963. The Award of Board 282 established a procedure permitting the elimination of 90% Of the firemen (helper) positions which the carriers considered an unnecessary overmanning. The BLFE contended that this Award was limited by 4 of Public Law 88-108 to a life of 'two years from the date the award takes effect,' that on expiration of the Award in 1966 the work rules in effect on the carriers reverted to the work rules in effect prior to the passage in 1963 of Public Law 88-108. While we agreed that this contention had logic, we considered that the intention of Congress could not reasonably be taken to 'obliterate not only the Award as a document with legal effect but also the physical facts that came into being during the 2-year period.'[3] We held:
 
 
 7
 Our ruling is that the work rules created by the Award constituted a new plateau that was not automatically eroded when the Award expired. The legal underpinning for our ruling is not the Joint Resolution, which expired after 180 days of life-- except insofar as necessary to sanction the Award. The ruling is not based on the Award, which had only a 2-year life, or on any agreement of the parties. The predicate of our ruling is, simply, the force of the Railway Labor Act. Certain work rules were in force on January 24, 1966 (or March 30, 1966, in the case of the BLFE). The mandate of the Railway Labor Act requires that the work rules in effect on any particular day shall also be in effect the following day-- beyond the power of either party to institute a unilateral modification-- subject to change only in accordance with the procedures prescribed by the Act. * * * What we are in effect holding is that since Public Law 88-108 is silent as to the applicable legal rule, the case is governed by the combination of undeniable physical facts plus the general legal rule of the Railway Labor Act.[4]
 
 
 8
 We invited the parties to request supplemental rulings on any matters not explicitly covered by our original opinion. A question arose as to the status of the 'blanking' procedure developed by Board 282 which we described as follows:[5]
 
 
 9
 On the firemen issue, Board 282 decided that most firemen could be dispensed with for other than steam power engines. It developed a procedure permitting the 'blanking' of firemen positions as follows: Each carrier could list those engine crews on which it thought firemen unnecessary for reasons of safety or workload. These positions could then be blanked, except that each local union chairman was given the right within 30 days of receipt of the carrier's list to designate up to ten percent of these crews as requiring continued employment of firemen. The Award refers to this right to designation as based upon considerations of safety, undue work burden and adequate and safe service to the public, but provided that the designation shall not be subject to challenge or review. This procedure was designed to take place at three month intervals.
 
 
 10
 The BLFE contended the procedures expired with the Award. The carriers contended the procedures were part of the new plateau of work rules. The District Court held that under the 'new plateau' the carriers could preserve what they had accomplished in reducing firemen's positions but could not use the machinery to make further job cuts; but that while the carriers could not take affirmative acts in reliance on the award they could refuse to fill vacancies resulting from attrition.
 
 
 11
 We held that the issue was as to the work rules resulting from the Award that endure by virtue of the Railway Act just as if incorporated into agreements. 'We must therefore discern what 'work rules' were put into effect under and prior to the expiration of Award.'[6] We concluded that the Award's blanking (and vetoing) procedure for making reductions was a procedure that expired with the Award and not a 'work rule' that survived. 'What survives is the complex of work rules in force on the last day prescribing the substantive terms that controlled the use of firemen on individual runs.'[7] We then set forth the consequence of our ruling in this language:[8]
 
 
 12
 'In consequence, a carrier is not only prevented from taking 'affirmative acts' under the Award to reduce the use of firemen, as the District Court properly held, but also, if the carrier was required to keep a fireman on a particular crew as of the last day of the Award, it cannot thereafter change the work rule by discontinuing that position, except by agreement or in accordance with Section 6. The work rule that continues in force provides for a fireman on this crew, and that is not changed because the particular fireman on duty dies or retires.'
 
 
 13
 'The National Diesel Agreement was not set aside by the Board. As already noted, the opening section of the Award provided that agreements in force continued in effect except as they were modified by the Award. The Award provided a procedure for modifications during the two-year life of the Award. We recognize that it may be turning back the clock to an era that two presidential boards and the Neutral Members of Board 282 have agreed is technologically outdated, but taking into account the structure of Award 282 as issued, we see no alternative to holding that any new runs created after Award 282 are subject to the National Diesel Agreement, and its requirement of a fireman on each engine crew.'
 
 
 14
 The differences of opinion that arise with respect to our ruling may be grouped as follows: The carriers contend the Union may not claim there are new runs requiring application of the Diesel Agreement if the run involved does not represent an addition by the carrier causing the number of blanked runs to exceed the maximum number of runs that it listed for blanking during the life of the Award. Another broad issue is whether a run constitutes a 'new run' if it was listed for blanking by the carrier during the Award but was thereafter removed, or disestablished, from the blanking list posted by the carrier for the period ending on the last day of the Award. The final issue concerns the degree of modification of a run, that was duly listed by the carrier under the Award and is governed by a work rule dispensing with firemen that endures after the Award, that may be permitted without constituting this as a new run requiring a fireman helper by virtue of the 1950 National Diesel Agreement.
 
 
 15
 The District Court's ruling insofar as now pertinent,[9] was as follows:[10]
 
 
 16
 'First, a 'new run' is a run that was not listed by the carrier and subject to veto in a particular seniority district at any time during the period of the Award.
 
 
 17
 'Second, a 'new run' is a run which exceeds the maximum number of runs listed by the carrier and subject to veto in a particular seniority district during the period of the Award. '(A) temporary discontinuance of any run which had been listed during the period of the Award would not be sufficient to constitute it a 'new run,' i.e., a 'new run' is not created by seasonal stoppages, by changes of crew personnel, by changes in mileage of the run, by changes in the time required, or in the salary paid to the crew. New stops on an old route which do not substantially change the route, or new starting or terminal points do not constitute a 'new run'. A run reinstated after an act of God such as a hurricane, a tornado, or a flood, or a disaster, or a strike, all of which would disrupt or temporarily discontinue rail service, would not constitute a new run.'
 
 
 18
 Invalidity of addition of quantitative test involving number of carrier runs as criterion for existence of new runs
 
 
 19
 The first issue concerns crews established after March 31, 1966, for entirely new railroad operations created since the Award's expiration. These crews were not listed for fireman abolition during the life of the Award. The District Court accepted the carriers' position that new railroad operations do not require the use of fireman so long as the total number of crews in the seniority district does not exceed the maximum number listed at any time during the life of the Award. We hold that the District Court erred in engrafting a quantitative 'level of operations' on the new runs concept.
 
 
 20
 The carriers seek to justify their view, and the holding of the District Court, by reference to a dominant intention, gleaned from certain indications, that this court's 'new run' holding was intended to prevent the carriers from using the Award to increase the number of crews that could be operated without a fireman, but did not intend to bring about a progressive reduction in the number of crews that could be operated without a fireman. This intention is said to be implicit in what is said to be this court's adoption of Judge Holtzoff's 'new plateau' concept.
 
 
 21
 This court built on the new plateau concept voiced by Judge Holtzoff,[11] but it did not preserve Judge Holtzoff's concepts intact. It rather provided an analysis which sought to relate the rights and duties of the parties to the structure of the Railway Labor Act. The Key concept was the maintenance of the work rules put into effect under the Award, treating these as 'deemed' to be incorporated in the agreements of the carriers and the unions. The work rules embraced the listings made by the carriers as not requiring fireman helpers (except as the carrier listings were qualified by the limited veto granted to the Union). But where an operation was never listed by the carrier as not requiring fireman helpers there is no basis for saying a work rule has been put into effect under the Award that dispensed with firemen on this operation. Accordingly as to such operation the only agreement in effect is the National Diesel Agreement. We recognized that to some extent this might turn the clock back. But we saw this as a consequence of the limited life provided by the statute for the Award and for maintaining a machinery to provide on-going modifications in the Diesel Agreement, and its requirement of a fireman-helper to apply to new operations projected by carriers.
 
 
 22
 Issue of runs of operations blanked by the carriers during the Award but not listed on last day of Award
 
 
 23
 We turn to the issue of jobs on a crew or run that was effectively listed by the carrier for blanking during the Award but was not included in the list of crews posted by the carrier for the final period ending with expiration of the Award.
 
 
 24
 The BLFE concedes that the Award work rule dispensing with firemen would be in effect as to any crew that was included in the final carrier list, and would not be affected by a temporary circumstance that caused the crew to be inoperative that day-- due e.g., to act of God, or strike of the factory involved. But it contends that the Diesel Agreement is in effect unless the crew was in a status as of the last day of the Award of a crew then listed under the Award for fireman blanking.
 
 
 25
 What our Akron opinion sets forth. essentially, is that the validity of what a carrier seeks to do in limiting firemen personnel on its operations depends on whether its action is to be considered as an implementation of the work rules it lawfully established during the Award (subject to the Union's veto) or whether it represents a change, or new work rule, which requires notice of change in accordance with Section 6 of the Railway Labor Act.
 
 
 26
 Our holding was rooted in the concept that the work rules put in effect under the Award continue in effect unless changed in accordance with Section 6.
 
 
 27
 The BLFE stresses a number of passages in the opinion referring to 'the work rule in effect on the last day of the Award.' 128 U.S.App.D.C. at 89, 385 F.2d at 611. We are aware of those passages, and are likewise aware of passages like that in the text to fn. 6 of this opinion, referring to the continuance of work rules put into effect under and during the Award.
 
 
 28
 What counts is the underlying approach of the opinion. That approach was to consider that the carriers were not now-- subsequent to the Award's expiration-- to be permitted to post new positions for reduction or elimination. As we pointed out,-- 'For two years plus, the carriers had the machinery for proposing, at three month intervals, the crews that they thought could safely and efficiently dispense with firemen positions.'[12] The carriers had had the benefit of 'an efficient procedure * * * for making specific decisions,'[13] and if for any reason they did not reach specific decisions during the Award the Congressional intent, defined in the limited life of the Award, did not countenance that the carriers would have at hand a continuing machinery, initially provided by the Board, 'whereby firemen should be subject to continuing reductions.'[14]
 
 
 29
 Whether a work rule is in effect under the Award for purposes of continuation after its expiration cannot be determined by looking mechanically at the literal state of affairs on the 1966 expiration date. That was brought out in our 1969 Galveston Wharves decision.[15] That case concerned the provision of the Award specifying that 'no yard locomotive shall be operated without a fireman (helper) unless and until it is equipped with a deadman control in good operating condition.' Galveston Wharves had ordered deadman controls early in 1965, but due to delays in delivery and imperfections the equipment was not installed until December 1966, nine months after expiration of the Award. We held that the work rule dispensing with the firemen was in effect during the Award, for purposes of post-Award survival, even though it was not being implemented, and could not physically be implemented, as of the last day of the Award. We distinguished the case where the Board had no legal authority as of the last day of the Award-- due to state 'full crew' laws. Where it was only the happenstance of temporary, or at least passing, physical circumstances that precluded implementation of the no-fireman work rule on the last day of the Award, we considered that the work rule was in effect but was, so to speak, in a state of suspended animation-- waiting for the conditions permitting its application.
 
 
 30
 Let us proceed to the case of a seasonal run,-- say a harvest-time run originating at some fruit and vegetable gathering point that was not operating when the Award expired at the end of March, 1966. It would be pushing reasonable concepts to unreasonable extremes to say that the seasonable rein stitution of this harvest run in, say, August, 1966, represented a 'new' run and new work rule, even though the same run in August, 1965, had been listed by the carrier and carried no firemen. There was no lack of legal capacity. The carrier was not trying in the summer of 1966 to do something new or different from what it could do and had done during the Award by a specific decision embodying its view of the requirements of safety and efficiency.
 
 
 31
 The same result obtains, we think, when an operation is terminated and then restored as a result of, say, business fluctuations, or plant vacations, or a plant strike, or curtailment in plant operations due to high customer inventories.[16]
 
 
 32
 We affirm the District Court's interpretation that a run or operation listed by the carrier during the life of the Award is not to be considered a 'new run' when restored or recalled after expiration of the Award.[17] And we do not think a contrary result is required by the circumstance that the carrier formally 'disestablished' the crew or run during the life of the Award. This seems to have been primarily a matter of mechanical technique for implementing, rather than for abandoning or modifying, the new 'no firemen' work rules.[18]
 
 
 33
 Alteration of runs after expiration of the Award
 
 
 34
 The BLFE suggests that the degree of alteration of a run, after expiration of the Award, that brings about a 'new run' should be determined by reference to the agreements between carriers and the BLFE which identify those changes in a run that are significant enough to require a carrier to rebulletin the job for bids by individual firemen under the seniority rules. As noted in the affida vit of Mr. J. L. Shattuck, submitted by the carriers, firemen are not permanently assigned to jobs but have a seniority bidding system that permits men to exercise their right to bid their seniority whenever the carriers have posted (bulletined) the assembly of a new crew for a new run or job.
 
 
 35
 We agree with the District Court that the determination of whether a work rule governing a situation is changed cannot be defined by reference to the kind of change that gives firemen a seniority right to bid for a job. A carrier cannot fairly be held to have agreed to the significance of a change from the viewpoint of when a fireman is required to be on a crew by its willingness to agree that, assuming a fireman is required, an occasion has arisen for seniority bidding to determine which individual shall be on the crew.
 
 
 36
 The carriers proposed as a test for when alterations constitute a new run that a 'new run' is not brought into being by virtue of changes-- e.g., in starting times, hours or days of operation, total mileage, route covered, and starting or ending points-- that 'do not substantially change the essential purpose or function of the operation as to make it a new operation having no direct causal relationship to an operation in existence during the effective period of the Award.' The 'direct causal relationship' language was used by Public Law Board No. 117.[19]
 
 
 37
 While the concept of 'direct causal relationship' is not irrelevant it seems inappropriate as an ultimate test. Runs with different safety and efficiency aspects may be causally related in the sense that one replaced the other. We note that this concept is not used in a subsequent Award, by Public Law Board No. 207, with the same Neutral Member, which uses instead the concept of whether there has been a 'material change' in the assignment.[20] These Award opinions relate to the crew consist work rules, but they have some transfer to the considerations involved in the fireman manning work rules before us. A similar approach appears in the District Court's ruling that new stops on an old route do not constitute a new run if they do not 'substantially' change the route.[21]
 
 
 38
 Carriers may contend that few if any changes were 'material,' since firemen helpers are not needed on any of the operations. The BLFE may contend that many changes are material in fact, even if this is not established conclusively by seniority bidding. We have no way to clarify our ruling further since the record has not been shaped by presentation of specific cases or even types of cases. We can only summon generalities. The work rules established during the Award must be construed reasonably to avoid straitjacketing a carrier, and to give it substantial latitude to increase efficiency and to make modifications in such matters as schedules, mileage, times, and particular points served, without triggering a fireman requirement. On the other hand a carrier cannot avoid the fireman requirement merely by casting what is essentially a new run or operation in the form of a modification of an existing run. Disputes as to the application of this opinion to particular situations, like disputes as to the meaning of general terms in a contract, are more appropriately referred to boards of adjustment than to the courts. However, the interest of justice and avoidance of undue friction may warrant the District Court in exercising its continuing residual jurisdiction to resolve disputes concerning the effect of the court's judgment especially when problems of broad general application can be identified.
 
 
 39
 The judgment of the District Court is affirmed in part and reversed in part. The case is remanded for further proceedings not inconsistent with this opinion.
 
 
 40
 So ordered.
 
 
 
 [1]
 On remand the District Court entered a new judgment which 'reaffirmed and reentered' its May 12, 1966, judgment 'as modified by the opinions and judgment' of this court
 
 
 [2]
 Order at 3, October 23, 1969, Brotherhood of Locomotive Firemen and Enginemen v. Bangor & Aroostook R.R., 136 U.S.App.D.C. 230, 420 F.2d 72
 
 
 [3]
 128 U.S.App.D.C. at 72, 385 F.2d at 594
 
 
 [4]
 128 U.S.App.D.C. at 71, 385 F.2d at 593
 
 
 [5]
 128 U.S.App.D.C. at 86, 385 F.2d at 608
 
 
 [6]
 128 U.S.App.D.C. at 87, 385 F.2d at 609
 
 
 [7]
 128 U.S.App.D.C. at 88, 385 F.2d at 610
 
 
 [8]
 128 U.S.App.D.C. at 89, 385 F.2d at 611
 
 
 [9]
 The BLFE has not appealed from that part of the ruling of the District Court that provided: 'Thus 'new run' has no application to extra crews and crews made up from boards or extra lists not subject to the veto procedure.'
 
 
 [10]
 Bangor & Aroostook R.R. v. Brotherhood of Locomotive Firemen and Enginemen, 310 F.Supp. 914, 919 (D.D.C.1970)
 
 
 [11]
 Bangor & Aroostook R.R. v. Brotherhood of Locomotive Firemen and Enginemen, 253 F.Supp. 682 (D.D.C.1966); Akron & B.B.R.R. v. Brotherhood of Railroad Trainmen, 250 F.Supp. 691 (D.D.C.1966)
 
 
 [12]
 128 U.S.App.D.C. at 88, 385 F.2d at 610
 
 
 [13]
 Id
 
 
 [14]
 128 U.S.App.D.C. at 87, 385 F.2d at 609
 
 
 [15]
 Brotherhood of Locomotive Firemen and Enginemen v. Bangor & Aroostook R.R., 136 U.S.App.D.C. 235, 420 F.2d 77 (1969)
 
 
 [16]
 The affidavit submitted by the carriers reported, on information, that officers of the BLFE asserted that restoration of crews in these instances constituted 'new runs.' We take this into account only for the limited purpose of considering the kind of questions that might arise
 
 
 [17]
 Conceivably a particular carrier listing and delisting related to a situation of a considered withdrawal that was intended at the time to be indefinite or even permanent. In view of the likelihood that such situations were minor in degree we think a clear-cut rule, when available, is in the interest of justice. And since any such listing reflected a work rule put into effect by a carrier under the Award, we do not consider this a deviation from ascertainable Congressional intent
 The BLFE's brief adverts to a different matter, to the possibility that the District Court's position may operate to undermine the substance of the 10% Veto of carrier listing which Award 282 provided. We would hope that the carriers would not be so imprudent as to jeopardize, by such abuse, the latitude given them by this opinion. However, to obviate possible ambiguity and dispute we herewith make clear that the only kind of work rules that can be claimed by the carriers to endure over the opposition of the BLFE are work rules that could have been and were established under the Award, and that this concept simply does not permit a selective rearrangement of positions in such a way as to enable the carriers to avoid the BLFE's 10% Retention which was inherent in the Award as a qualification and limitation of new work rules of the carriers under the Award.
 
 
 [18]
 We think this is the fair implication of the carriers' affidavits, which were not contradicted or subjected to cross-examination. The carriers say (Br. 48): 'The purpose of the 90-day lists was not to determine whether a crew or run was 'new', but to permit periodic adjustment of the number of vetoes in the light of the number of crews then being operated so as roughly to maintain the 10% Limit. The practices of the various carriers in compiling such lists varied widely without objection by the BLFE, and Board 282 never had occasion to determine what the Award required in that regard as the variations did not result in any difference in the number of vetoes so long as a particular carrier was consistent in whatever practice it followed.'
 
 
 [19]
 Brotherhood of Railroad Trainmen and Atlanta Joint Terminal, March 22, 1968. The situation involved the reestablishment and rebulletining of a crew with a change in rest days, after it had been discontinued for over three months for lack of business. The carrier argued: 'None of the basic elements of the original assignment has been changed. The assignment bears the same number, it still has the same point for going off and going on duty, the same shift hours, the same nature and amount of work. In short, it is the same assignment. The change in the off days is not a material change.'
 The award of the Board (whose neutral member was Jacob Seidenberg) stated:
 'The change in the rest days did not convert the original assignment into a completely new assignment. The Board finds that there is a direct causal relationship between the original and the reestablished assignment.'
 
 
 [20]
 Brotherhood of Railroad Trainmen and Chicago, Milwaukee, St. Paul & P.R.R. (Lines East), Award No. 16, January 17, 1969. A special board under Award 282 gave the carrier authority to operate, with a crew count of one yard foreman and one helper, three yard assignments at Davenport and two at Nahant, and 'assignments which may hereafter be established which perform substantially similar work.' The Davenport Yard was substantially abandoned and the carrier transferred the work to positions at Nahant. The Union contended the assignments were 'greatly changed,' involving a new location with entirely different characteristics. (Nahant is a classification yard of 16 tracks, the longest accommodating 80 cars. The longest track at Davenport could accommodate only 22 cars.)
 The Award states: 'The board finds, on balance that (the) Assignments * * * were materially changed by the Carrier on or after January 24, 1966. These assignments, after the change date, now commenced and terminated their operations in another yard; a yard which had different characteristics, different kinds of supervisors, and different duties.'
 
 
 [21]
 Although the wording of the Disrrict Court's ruling is susceptible of the interpretation that changes in mileage, times, starting and terminal points, can never constitute a new run, no matter how 'substantial,' that does not seem to us its fair intent, and we do not approve any contention to that effect